455 So.2d 1351 (1984)
STATE of Louisiana
v.
Louis CRUZ, Jr.
No. 82-KA-2104.
Supreme Court of Louisiana.
September 10, 1984.
*1352 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Louise Korns, Phillip Boudousque, Clarence McManus, Patrick Leitz, Gerald Alonzo, Robert Pitre, Asst. Dist. Attys., for plaintiff-appellee.
Rebecca Sawyer, New Orleans, for defendant-appellant.
DENNIS, Justice.
Defendant, Louis Cruz was convicted by a jury of first degree murder, La.R.S. 14:30, but the jury was unable to agree on a penalty recommendation. The trial court in accord with law sentenced defendant to life imprisonment without benefit of probation, *1353 parole or suspension of sentence. Defendant appealed.

FACTS
On the morning of August 22, 1981, the body of twenty-two year old Susan Todorov was discovered floating in the Mississippi River in Jefferson Parish near Gretna, Louisiana. The body, clad only in a bra and blouse, was found about 30 feet from shore near a barge dock and other property owned by the J.W. Stone Oil Company. On the batture, between the levee and the water's edge, were a pair of underpants, a shoe, a matchbook from Gatsby's Lounge and a pack of Winston cigarettes. On a wharf nearby, there was a woman's silver chain minus its diamond pendant. Police observed footprints and drag marks, four to five feet from the underwear, leading down to the river. The clothing, shoe and chain were identified as Todorov's; a set of diamond earrings and a watch she wore when last seen were missing. According to Todorov's mother, the 4' 10", 85 pound victim could not swim and was terrified of water.
Todorov was last seen alive leaving Gatsby's Lounge in Gretna with Louis Cruz, the defendant, on the evening of July 19. She had been celebrating her forthcoming marriage with two girl friends, Jo Alice and Penny. Her fiancé stopped by the lounge momentarily that night to swap cars, leaving Todorov his orange Trans Am. According to Jo Alice, while at Gatsby's the women met and talked with Louis Cruz, the defendant. Jo Alice and Todorov left the bar several times to go to the parking lot. There was evidence that Todorov, Jo Alice and Cruz were smoking marijuana that evening. Once, Jo Alice, Todorov and defendant went to the orange Trans Am together and Jo Alice put her brown purse, containing her wallet and house keys, under the passenger's seat in the front of the car.
A Jefferson Parish detective, Officer Rees, saw Todorov, Jo Alice and Cruz standing by the Trans Am outside Gatsby's at about two in the morning. He spoke with them momentarily, after which the two women rejoined Cruz and all three went back inside the lounge. Jo Alice testified that a few minutes later Todorov left the lounge and Cruz walked out behind her. Officer Rees testified that Todorov and Cruz got into the orange Trans Am and drove away.
Cruz was next seen at 6:00 a.m. at the Sahara Lounge in Belle Chase. A barmaid recognized him when she reported for work and also noticed an orange Trans Am parked nearby. Michael Bellamy testified that he saw Cruz about 9 a.m. in Belle Chase when Cruz gave Bellamy a ride in an orange Trans Am, which he claimed was a "company" car. Sometime during the ride, Bellamy noticed an object under his feet which he found to be a brown, ladies' purse that had come from under the passenger's seat.
Later that day, credit card purchases were recorded in Gretna, Biloxi and Pascagoula on the accounts of both Susan Todorov and her fiancé. The manager of a shoe store in Biloxi recalled one sale. He picked out defendant's photograph from a line-up and made a positive in-court identification of Cruz as the man who had used the credit card.
Between 10:30 and 11 p.m. on the evening of Thursday, August 20, 1981, Jo Alice was at home putting her child to bed when she heard a noise. She looked up and saw Cruz standing outside at an opened, unscreened window. He shook a set of keys, which she recognized as her own, and told her "I'm going to kill you like I killed her." Jo Alice saw an orange Trans Am parked outside. She screamed and ran into the room where her sister and brother-in-law were sleeping. When Jo Alice returned with her brother-in-law to the window where she had seen Cruz, both he and the Trans Am were gone.
On Saturday, August 22, 1981, the body of Susan Todorov was recovered from the river. According to Dr. Alvaro Hunt, the pathologist who performed the autopsy, the body was in an advanced stage of decomposition due to the high temperature of *1354 the atmosphere and water. There was no evidence of physical wounds or of bruising around the neck to suggest strangulation; no evidence of death by natural disease processes; and no evidence consistent with rape. The sole finding made by the pathologist was that a hemorrhage to two small bones had occurred. These bones, `petrous portion of the temporal bones' are located above and central to the internal ear near the base of the skull; a hemorrhage in this area is "very common" in deaths by drowning. Such a hemorrhage is also consistent with other forms of death by asphyxia. Dr. Hunt did not perform any tests to determine the presence and amount of alcohol or drugs in her body. He explained that decomposition "precluded ... any satisfactory drug analyses," for the process of decomposition itself produces alcohol. At the completion of the autopsy, Dr. Hunt concluded that he "was unable to determine the cause of death or the manner in which she died." During his trial testimony, however, Dr. Hunt stated that the pathological evidence was consistent with a death caused by drowning or asphyxia.
Four days after the autopsy Detective Dennis Dunn of the Gretna Police Department and members of the New Orleans Police Department executed a warrant for the arrest of Louis Cruz. Cruz was transported to the Algiers Police Station, where Dunn verbally advised him of his rights. Dunn asked if he wanted a cigarette and offered Cruz one from his own pack of Winstons. Cruz asked "[w]as that the same cigarettes you found on the river batture?" Detective Dunn then asked defendant Cruz whether he would like to waive his rights and make a written statement. Defendant declined, and requested to speak with an attorney.
Assignment of Error No. 1
Defendant argues that the trial court erred in denying the defendant's second motion for a new trial despite new evidence presented at a supplementary evidentiary hearing which demonstrated a prejudicial error and defect in the proceeding.
Dr. Hunt, the state's pathologist, testified at trial that he did not perform any tests to determine the presence and amount of alcohol or other drugs in the victim's body because its state of decomposition precluded any satisfactory drug analyses. Following decomposition, he said, the body produces its own alcohol and other compounds which interfere with the definitive determination of drugs and drug levels. At the evidentiary hearing on the new trial motion defendant presented testimony by a Tennessee pathologist to the effect that, although a body's decay makes analysis more difficult, there are tests which afford accurate toxicological measurements even under these circumstances. Dr. Hunt at the evidentiary hearing acknowledged the availability of such tests but testified that they are not as reliable as the Tennessee pathologist claimed. Dr. Hunt stated that the performance of such tests in the present case was unwarranted because of both the body's decomposition and the circumstances known to surround the crime at the time of the autopsy. Apparently, before the autopsy, Dr. Hunt was informed that Todorov's body was recovered from the Mississippi River, that she was known to have had a few drinks the night of her death, and that she was not known to have used drugs. Since there were no needle marks on the victim's arms, and since she was not known to use drugs, Dr. Hunt determined that a screen for drugs would be neither valuable nor appropriate. Both Dr. Hunt and the Tennessee pathologist testified that the final cause of Todorov's death probably was drowning.
Defendant contends that a new trial should have been granted because he proved that "injustice has been done the defendant" La.C.Cr.P. art. 851, par. 1, and that he "has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment...." La.C. Cr.P. art. 851(4). Defendant argues that the "prejudicial error or defect in the proceedings" was Dr. Hunt's failure to perform *1355 all tests available to detect alcohol and drugs in the victim's body and his failure to reveal his dereliction in his testimony at trial.
If the defendant had proved that Dr. Hunt testified falsely at trial or failed to disclose evidence favorable to the defense, perhaps this would constitute a "prejudicial error or defect in the proceedings" that would mandate a new trial if the failure to learn of the evidence was due to no lack of diligence by the defendant, was not discovered before the verdict or judgment, and resulted in the doing of an injustice to the accused. La.C.Cr.P. art. 851, par. 1, (4); Official Revision Comment (b). This conclusion is subject to question, however, because the ground for a new trial provided by La.C.Cr.P. art. 851(4) includes matters such as jury misconduct, improper separation of the jury without the defendant's immediate knowledge thereof, and false answers on voir dire examination, Id. Comment (d), and may not embrace false or misleading testimony.
The short answer to the problem posed by defendant, however, is that the evidence does not show that Dr. Hunt testified falsely or failed to disclose evidence favorable to the defendant. The evidence discloses only a difference of professional opinion between two pathologists as to the efficacy of drug analyses of decomposed bodies. Furthermore, even if the defendant had been able to present the Tennessee pathologist's viewpoint to the jury at trial it probably would not have changed the verdict or judgment of guilty. There was no evidence that Todorov abusively used drugs or alcohol immediately before she was last seen alive. The circumstances surrounding her deathsuch as the arrangement of her clothing and jewelry; her missing earrings and watch; the footprints and drag marks; the defendant's inculpatory statements, his possession of the victim's car and credit cards; and his threat of her companion's lifeindicate rather conclusively that Todorov was placed in the river by another involuntarily and died of asphyxiation or drowning.
Assignments of Error Nos. 2 and 3
Defendant contends there was not sufficient proof that the defendant had the requisite specific intent to kill or inflict great bodily harm upon the deceased and was engaged in the perpetration or attempted perpetration of a specified felony as required by La.R.S. 14:30(1). For essentially the same reasons we concluded that more detailed pathological testimony probably would not have changed the verdict of guilty, we conclude that the evidence was sufficient to support it. Cruz was the last person with whom Todorov was seen alive. Cruz's place of employment was the scene of her death. Cruz made two inculpatory statements, one expressly confessing and another indicating that he had killed her. Cruz had possession of her car and credit cards shortly after she was last seen alive; he kept them and used them under false pretenses for his benefit for one day while she was missing. Cruz lied to a friend about who owned the car and his authority to use it; he abandoned the vehicle in a project. The arrangement of Todorov's clothes and jewelry, the missing diamond pendant, earrings and watch, the footprints and drag marks at water's edge indicated she was robbed and forced into the water by Cruz who desired at least to inflict great bodily harm upon her. Thus, the evidence supports a specific intent homicide while the offender was engaged in simple robbery.
Assignments of Error Nos. 4 and 5
Defendant argues that the prosecution failed to establish the corpus delicti with evidence other than the confession. It is well settled that an accused party cannot be legally convicted on his own uncorroborated confession without proof that a crime had been committed by someone; in other words, without proof of the corpus delicti. State v. Willie, 410 So.2d 1019 (La.1982); State v. Ashley, 354 So.2d 528 (La.1978); State v. Mullins, 353 So.2d 243 (La.1977); State v. Freetime, 334 So.2d 207 (La.1976); State v. Sellers, 292 So.2d 222 (La.1974); *1356 State v. Brown, 236 La. 562, 108 So.2d 233 (1959); State v. Calloway, 196 La. 496, 199 So. 403 (1940); State v. Morgan, 157 La. 962, 103 So. 278 (1925).
We have described the direct and circumstantial evidence by which the state proved defendant's guilt in earlier portions of this opinion. Except for the inculpatory statements, all of this evidence was available for the jury's consideration in deciding whether the corpus delicti had been established. Without recounting this evidence in detail again, we conclude that it was sufficient to establish the death of Todorov and that her death was caused by the criminal agency of someone.
Assignment of Error No. 6
Defendant contends the trial court erred in failing to give a charge requiring the jury to find that a homicide had been committed beyond a reasonable doubt before considering the defendant's inculpatory statements. This argument is without merit because the defendant neither requested this charge nor objected to its omission.
Defendant also contends the trial court erred in failing or refusing to instruct the jury on the definition of homicide. It appears from the record that defense counsel did not request this instruction as provided by La.C.Cr.P. art. 807. Defendant therefore, in effect argues that the trial court was required by law to give the requested jury charges. This argument is without merit.
Defense counsel objected to the court's failure to instruct concerning the definition of homicide. The trial judge overruled the objection because the definition of first degree murder, for which the defendant was on trial, does not contain the term "homicide" but rather defines murder as "the killing of a human being." Homicide, also, is defined in by La.R.S. 14:29 as "the killing of a human being by the act, procurement, or culpable omission of another." Thus, the trial court's general charge both adequately instructed the jury as to the law applicable to the case and included the material with which the defense indicated it wished the jury to be specially charged.
For the reasons assigned, each of the assignments of error is without merit, and the defendant's conviction and sentence are affirmed.
AFFIRMED.