700 So.2d 810 (1997)
STATE of Louisiana
v.
John Malachi CONNOLLY, III.
No. 96-KA-1680.
Supreme Court of Louisiana.
July 1, 1997.
*812 M. Craig Colwart, Franklin, for Applicant.
Richard P. Ieyoub, Attorney General, Bernard E. Boudreaux, Jr., New Iberia, James R. McClelland, Franklin, for Respondent.
KIMBALL, Justice.[*]
A St. Mary Parish Grand Jury indicted John Malachi Connolly, III for the first degree murder of Shane Michael Pullen, in violation of La. R.S. 14:30. After a trial by jury, Defendant was found guilty as charged and sentenced to death based upon the jury's finding of three aggravating circumstances. The trial judge sentenced Defendant to death in accordance with the jury's recommendation. This is the direct appeal of Defendant's conviction and sentence.
On appeal, Defendant relies on seven assignments of error. For the reasons that follow, we find no merit in any of Defendant's assignments and affirm Defendant's conviction and sentence.

*813 FACTS
On the evening of October 7, 1992, Shane Michael Pullen, a nine year old boy, was murdered behind the First Baptist Church of Morgan City. The victim had attended church services that evening with his mother, father, and older brother. After the service ended, the victim mingled with other members of the congregation. Sometime around 7:30 p.m., the victim's family noticed he was missing. The Pullen family and other church members searched the church building and grounds for the victim. Defendant, a Sunday school teacher at the church who had also attended church services that night, persuaded the victim's father, Perry Pullen, to search behind the church for his son. Behind the church, Perry Pullen discovered his son's bloody body lying on the ground.
With the help of Reverend Johnson and Defendant, Perry Pullen took the victim to Lakewood Medical Hospital in Morgan City. At the hospital, the victim who had sustained several knife wounds including a fatal cutting of the throat, was pronounced dead. In the course of examining the victim, doctors noted that the victim's anus was widely dilated, a finding consistent with sexual penetration.
Police questioned various witnesses at the hospital about the murder. The investigation quickly focused on Defendant, who was acting strangely. Detective Banks initially questioned Defendant in the X-ray room at the hospital. After being informed by police that he was not under arrest, Defendant agreed to accompany the police to the Morgan City Police Station.
At the station, Defendant was again informed he was not under arrest and was also given his Miranda rights. Defendant signed a waiver of rights form. Detective Banks, Detective Peterson and Agent Marino interviewed Defendant. While Agent Marino was speaking to Defendant, he confessed to killing Shane Pullen. Subsequent to his initial confession, Defendant gave a taped confession and took the officers back to the church to walk them through the events which led to the victim's death, and to show them where he had hidden the knife and the victim's shirt.
According to Defendant, after church services, he went behind the church to catch lizards to feed to his pet reptiles. While behind the church, Defendant stated he experienced an attack of anger. Defendant maintains he frequently experienced anger attacks which were triggered by his memory of being molested when he was a young boy by an acquaintance of his father, Mr. Cox. To handle these anger attacks, Defendant would go off by himself to punch and kick the ground. Defendant recounted that the victim observed him bending down on his hands and knees punching the ground. Defendant claims he thought the victim was Mr. Cox, when the victim asked Defendant what was wrong and put his hand on Defendant's shoulder. Defendant grabbed the victim around the neck and pulled out his butterfly knife, and slashed the victim.
In his confession, Defendant contended he did not realize the victim was Shane Pullen, and not Mr. Cox until after he dropped the victim on the ground. At that point, Defendant claims he removed the victim's shirt to use it to try and stop the bleeding. However, there was so much blood that Defendant panicked, stuffed the shirt in his pocket, and walked away. Later, Defendant discarded the shirt under a shed, washed his hands in the bathroom, and hid the knife in the trunk of his car. Defendant maintained he did not sexually molest the victim.[1] At the guilt phase of his trial, Defendant admitted all of the above facts to the jury; however, Defendant contended he was only guilty of manslaughter and not first degree murder.
While Defendant was at the church with the police officers recreating the events surrounding Shane Pullen's murder, one of the officers asked Defendant if he had ever killed anyone before, and if in 1989, he killed a boy from Berwick named Lawrence Topham. At that point, Defendant admitted to killing Lawrence Topham, who was twelve years old at the time of his death. Defendant stated *814 he and Lawrence Topham lived in the same trailer park and that Topham would often visit the Defendant at his trailer. According to Defendant's confession, Defendant went into the woods at the trailer park so he could be alone. Topham asked Defendant what was he doing out in the woods since the woods were flooded. Instead of answering Topham, Defendant stated he grabbed the boy and choked him until his body went limp, and dropped him into a ditch filled with about eighteen inches of water. At the time of Topham's death, both the coroner and the police attributed his death to accidental drowning. In addition to confessing to the police, Defendant also confessed his involvement in Topham's death to his attorney, to Reverend Johnson, and to members of his own family. However, Defendant later recanted his confessions concerning his involvement in Topham's death. Defendant stated he confessed to killing Topham because he just wanted to die for killing Shane Pullen. Defendant has been indicted for the second degree murder of Topham, but has not yet gone to trial on that charge. Evidence concerning the death of Lawrence Topham was not admitted in the guilt phase of the trial; however, it was admitted in the penalty phase of the trial.
On January 26, 1995, the jury found Defendant guilty of first degree murder. The jury returned a guilty verdict under a charge which defined first degree murder disjunctively as the specific intent homicide of a person under the age of twelve years or a specific intent homicide committed in the course of an aggravated rape. The jury returned a penalty of death based upon their finding of three aggravating circumstances: (a) defendant was engaged in the perpetration or attempted perpetration of aggravated rape; (b) the offense was committed in an especially heinous, atrocious, or cruel manner; and (c) the victim was under the age of twelve years. In accordance with the jury's recommendation, the trial judge formally sentenced Defendant to death.

LAW AND DISCUSSION
On appeal, Defendant alleges seven assignments of error,[2] which this court will address in the following order: pre-trial issues and penalty phase issues, as there are no assignments of error pertaining to the guilt phase.

PRETRIAL ISSUES

Change of Venue
Defendant contends his conviction and sentence should be reversed based upon the trial court's failure to grant his motion for a change of venue on the grounds that the extent and nature of pretrial publicity and many of the prospective jurors' responses on voir dire show it was impossible for him to have received a fair and impartial trial in St. Mary Parish. The trial judge deferred ruling on the motion until voir dire was conducted.
La.C.Cr.P. art. 622[3] governs the grounds for a change of venue. To obtain a change of venue in any case in which the trial atmosphere has not been "utterly corrupted by press coverage," Murphy v. Florida, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975), a defendant "must prove that there exists a prejudice in the collective minds of the community that would make a fair trial impossible." State v. Lee, 559 So.2d 1310, 1313 (La.1990), cert. denied, 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991). However, "extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial unconstitutionally unfair." Dobbert v. *815 Florida, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). La.C.Cr.P. art. 622 requires that the defendant "must prove more than mere public knowledge of facts surrounding the offense to be entitled to have his trial moved to another parish." State v. Comeaux, 514 So.2d 84, 90 (La.1987).
Defendant's trial began in January 1995, over two years after the murder and first flurry of publicity. Three newspaper articles concerning the murder of Shane Pullen were introduced by the defense. Immediately after the murder, The Banner Tribune printed an article detailing the basic facts surrounding the crime. On July 20, 1993, The Daily Review printed a brief article concerning the basic facts surrounding the crime. The Daily Review also printed an article on June 24, 1994, which stated that Defendant's trial had been rescheduled and mentioned the fact that Defendant was involved in the murder of Lawrence Topham. According to the defense, details concerning the Pullen murder were also aired on television and radio stations which were broadcast in St. Mary Parish. These brief factual accounts of the murder did not result in a trial atmosphere which was utterly corrupted by press coverage. Thus, under Lee, 559 So.2d at 1313, Defendant must prove there existed such prejudice in the minds of the community from which the venire was selected that he was prevented from receiving a fair trial.
According to the information gathered through voir dire, 86.33% (120 out of 139) of the jurors were aware of the Pullen murder prior to trial. While this percentage appears to be significantly high, a close examination of the individual juror's responses on voir dire reveals most of the jurors had only a rudimentary knowledge of the basic facts surrounding the case. The prospective jurors stated their predominate sources of information concerning the case were newspaper accounts and word of mouth. However, a vast majority of the jurors had only a vague recollection of the basic facts surrounding the crime and did not remember any specific details concerning the crime. Defendant is not entitled to a jury that is entirely ignorant of his case. State v. Thompson, 516 So.2d 349, 352 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).
Each prospective juror was questioned individually concerning their knowledge of the events surrounding the crime and their opinions concerning Defendant's guilt or innocence. Most of the prospective jurors stated they had not yet formed a definite opinion concerning Defendant's guilt or innocence, and would hear all of the evidence before rendering a decision. Furthermore, we note that any juror who had extensive knowledge of the facts of the crime and had already made a decision concerning Defendant's guilt or innocence was excused for cause. On the whole, a review of the prospective juror's responses does not reveal a prejudice existing in the minds of the community from which the venire was selected to support a conclusion that Defendant was denied a fair and impartial trial.

Denial of Cause Challenges
Defendant maintains the trial judge erred by not striking the entire first panel of prospective jurors and four other prospective jurors based upon their knowledge of other crimes evidence which would not be admissible in the guilt phase of the trial. At the time he confessed to murdering Shane Pullen, Defendant also confessed to police that in 1989 he murdered Lawrence Topham. The Daily Review printed an article on June 24, 1994, linking Defendant to the murder of Topham, and there was also talk within the community suggesting a link between Defendant and Topham's murder. While evidence of Defendant's connection to the Lawrence Topham murder was introduced at the penalty phase of the trial, it was not introduced in the guilt stage of the trial.
A trial court is vested with broad discretion in ruling on challenges for cause and these rulings will only be reversed when a review of the voir dire as a whole reveals an abuse of discretion. State v. Cross, 93-1189 pp.6-7 (La.6/30/95), 658 So.2d 683, 686-87; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1281. Prejudice is presumed when a challenge for cause is erroneously denied by the trial judge and the defendant *816 has exhausted all of his peremptory challenges. State v. Divers, 94-0756 p.6 (La.9/5/96), 681 So.2d 320, 323; State v. Maxie, 93-2158 p.15 (La.4/10/95), 653 So.2d 526, 534. In order for a defendant to prove error warranting reversal of both his conviction and sentence, he need only show the following: (1) erroneous denial of a challenge for cause; and (2) use of all of his peremptory challenges. Maxie, 93-2158 p.15, 653 So.2d at 534. In this case, Defendant did exhaust all of his peremptory challenges. Thus, this court must determine whether the trial judge's failure to remove the following jurors for cause was erroneous.
All of the cause challenges to the following prospective jurors are governed by La. C.Cr.P. art. 797, which provides in pertinent part, that a defendant may challenge a juror for cause on the grounds that:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence.

1. Entire First Panel of Jurors
At the start of the voir dire, the trial judge collectively questioned six prospective jurors[4] concerning their knowledge of the facts surrounding the case. During the course of this questioning, prospective juror Luella M. Smith stated that she knew about the facts in the case "from a policeman in Berwick, and also from people where he had been involved with some of their children." The trial judge then asked prospective juror Smith if her knowledge of the case had caused her to form a fixed opinion that could not give way to any evidence presented in court. In response to this question, prospective juror Smith replied, "That is right. It was another child." The trial judge granted the State and Defendant's joint motion for cause, but denied Defendant's cause challenge to the entire first panel. However, the trial judge did ask the remaining prospective jurors whether what they heard from Smith caused them to form a fixed opinion.
Prospective juror Betty L. Bergeron stated she was puzzled by Smith's comments because she thought the trial only concerned one murdered child. Based upon this response, the trial judge excused prospective juror Bergeron for cause.
When defense counsel questioned prospective juror Linda M. Madison, she indicated she did not understand what Smith was implying by her comments concerning other children. Prospective juror Madison was later excused for cause based upon a Witherspoon challenge.
Prospective juror Lilia Uze was never questioned about Smith's comments. She was excused for cause because she stated she could not keep an open mind based upon what she read in the paper, considering the fact that she had a daughter.
Questioning of prospective juror Mickey P. Rogers revealed that she understood Smith's comments to imply that it could have happened to more than one child and not that Defendant was involved in more than one situation.[5] The trial judge denied defense counsel's challenge for cause to prospective juror Rogers. Defense counsel then used his first peremptory challenge to excuse Rogers.
*817 Carolyn Charles ultimately served on the jury. Juror Charles stated that she did not really hear what Smith said; thus, Smith's comments did not mean much to her. Defense counsel's cause challenge was denied by the trial judge. Instead of exercising a peremptory challenge against juror Charles, defense counsel accepted her as a juror. Thus, Defendant waived his right to assert this claim on appeal. State v. Bourque, 622 So.2d 198, 229-230 (La.1993); State v. Fallon, 290 So.2d 273, 282 (La.1974).
Therefore, out of the first panel, Defendant can only appeal the trial judge's denial of a cause challenge as to prospective juror Rogers. A review of Rogers' voir dire shows she did not even comprehend the fact that Smith was implying Defendant was involved in other murders. Furthermore, Rogers stated she could be a fair and impartial juror and that Smith's comments would not enter into her deliberations. Thus, it is clear under La.C.Cr.P. art. 797 that the trial judge did not abuse his discretion in denying Defendant's cause challenge.

2. Juror Elbert Beaubouef
Defendant challenged prospective Juror Beaubouef and the following three prospective jurors because they indicated they knew Defendant was linked to the murder of another child or children. The trial judge denied each of the cause challenges, finding that each juror demonstrated he or she could put that knowledge aside and decide the case only on the evidence presented in court.
When questioned about his knowledge concerning the facts of the case, prospective juror Beaubouef stated his sources of information were the television and word of mouth. Beaubouef could not remember any specific details concerning the case, nor could he even recall the Defendant's name. However, he did state that he learned from his father, a Berwick city councilman, that "someone had been killed and that they had lived in Berwick." When questioned by defense counsel about whether his information indicated someone was killed in Berwick or in Morgan City, Beaubouef replied,
[s]omeone had been killed. I mean, I don't know exactly where it took place or what happened. I just know that the defendant had been living in Berwick at the time or that he had known someone in Berwick. It was not, I did not go into great detail about who, where, when, it was just something that was, information given to me, and it was just taken.
Throughout his voir dire, Beaubouef steadfastly maintained he could put aside everything he had heard about the case and decide the case based solely on the evidence presented at trial.
Defense counsel challenged Beaubouef for cause based on his indication that he had spoken with Detective LaBouve, the officer who investigated Lawrence Topham's murder. According to defense counsel, Beaubouef had been exposed to evidence of other crimes which would not be admitted in the guilt phase of the trial. A review of Beaubouef's voir dire fails to indicate that he ever stated he had spoken with Detective LaBouve. However, he did state that he was friends with Detective Duval Arthur and many other officers on the Berwick police force. The trial judge denied the defense's cause challenge, finding that Beaubouef's answers demonstrated he was capable of conducting himself as a proper juror. Defense counsel peremptorily excused Beaubouef.

3. Tippanie Richard
Questioning of prospective juror Tippanie Richard revealed that she lived in Alabama at the time of the murder. However, while she was riding home from court (prior to being questioned on voir dire) with her cousin, her cousin asked, "[i]s that the man that was a Sunday school teacher?" When Richard responded that she was not allowed to discuss the case, her cousin went on to tell her that if the Defendant was the Sunday school teacher then "he took [the boy] out and raped him and slit his throat and then he  after he got caught or something he said that he was the same man that did it to some little boy thats (sic) lives in Berwick." Further questioning revealed that while Richard thought what happened was "kind of scary," she had not formed a fixed opinion concerning Defendant's guilt or innocence. When *818 asked if what she heard would influence her decision, Richard stated, "[n]o, `cause I really don't know what really happened, you know. I'm not gonna listen to what I heard. I mean I'm gonna listen to what goes down in court."
Defense counsel challenged Richard for cause based on her knowledge of other crimes evidence which were not admissible at the guilt phase. The trial judge denied the challenge based upon Richard's assurances she would decide the case based solely on the evidence presented in court. The State peremptorily excused Richard.

4. Becky Williams
Prospective juror Becky Williams was challenged for cause by Defendant based on her recollection of other crimes evidence which would not be admitted in the guilt phase of the trial. The trial judge denied the challenge because Williams assured the court she had not yet formed an opinion and would not consider the information in her deliberations. Instead of exercising one of his three remaining peremptory challenges, Defense counsel allowed Williams to be selected as a juror. Thus, Defendant waived his right to assert this claim on appeal. Bourque, 622 So.2d at 229-230; Fallon, 290 So.2d at 282.

5. Terry Niete
Prospective juror Niete was questioned after all twelve jurors and one alternate juror had been selected. Each side was allocated one peremptory strike for choosing the alternates, and Defendant used his on this juror.
When questioned about his knowledge of the facts surrounding the case, Niete replied that he had read about the case in the newspaper and heard about it from other people. In addition to knowing basic facts concerning the Pullen murder, Niete stated that he had, "read something about there was another one, another little boy that got killed in the trailer park over there or something like that  that investigation, something about that." When asked if what he read and heard about the case would enter into his deliberations, Niete responded, "[n]o. Like I said before, like if was me in the position I would appreciate it if somebody would have an open mind and sit there and listen to everything because obviously everything's not in the paper...." Niete went on to say that not everything printed in the paper is correct, and that whatever he read and heard about the case would not influence his decision.
Defendant challenged Niete for cause based on his knowledge of other crimes that would not be admissible in the guilt phase. The trial judge denied the challenge.
All of the above challenged jurors unequivocally stated they would decide the case based solely on the evidence presented at trial. However, such assurances are not always sufficient reason to deny a cause challenge. State v. Clark, 442 So.2d 1129 (La.1983). "Thus, while qualified jurors need not be totally ignorant of the facts and issues involved, so too the juror's assurances that he is equal to the task cannot be dispositive of the accused's rights." Id. at 1134 (citing Murphy v. Florida, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975)). A cause challenge should be granted when the juror's responses as a whole reveal facts from which bias, prejudice, or inability to render a fair judgment may be reasonably inferred. State v. Jones, 474 So.2d 919, 926 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986).
In Murphy, 421 U.S. at 800, 95 S.Ct. at 2036, the United States Supreme Court held that despite the fact some jurors knew of the defendant's past crimes, there was no hostility expressed by the jurors "to suggest a partiality that could not be laid aside." A review of each of the above juror's voir dire fails to reveal any basis for inferring they were unable to render a fair judgment. In fact, the responses of each challenged juror indicate they were willing and able to decide the case based solely on the evidence presented at trial. In addition, the fact prospective juror Beaubouef was friends with law enforcement officials was not grounds for an automatic cause challenge because he did not indicate he would view a police officer's testimony as more credible than that of any other witness. State v. Baldwin, 388 So.2d 664, 671 (La.1980), cert. *819 denied, 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830, reh'g denied, 450 U.S. 971, 101 S.Ct. 1493, 67 L.Ed.2d 622 (1981).
Based on the foregoing, we are unable to conclude the trial judge abused his discretion in denying Defendant's cause challenges to the above mentioned jurors.

PENALTY PHASE ISSUE

Other Crimes Evidence
Defendant argues the trial judge erred in allowing the jury in the penalty phase to hear evidence concerning Defendant's connection to the Lawrence Topham murder by denying his second motion to exclude evidence of other crimes in the penalty phase of his trial. Before trial commenced, the State provided notice of its intent to put on evidence in the penalty phase that Defendant murdered Topham. Initially, defense counsel conceded that such evidence would be relevant in the penalty phase. However, defense counsel made a second motion to exclude the evidence because the State could not meet jurisprudential requirements for unadjudicated crimes; specifically, the State could not prove the corpus delicti of the crime by evidence independent of Defendant's confession.
Defendant confessed to the police that he killed Lawrence Topham. At the time of Topham's death, Defendant and Topham lived in Parro's Trailer Park in Berwick. Defendant and Topham knew each other and Topham would often visit Defendant in Defendant's trailer. According to Defendant's confession, he went into the woods behind the trailer park so he could be alone. Topham approached Defendant and asked him what he was doing in the woods since the woods were flooded. Defendant told the police he responded by grabbing Topham by the throat, choking him, and throwing his body into a shallow ditch filled with about eighteen inches of water. In his confession, Defendant stated he was not sure whether Topham was still alive when he dropped his body into the ditch.
In addition to confessing his involvement in Topham's murder to the police, Defendant also confessed to his attorney, his family, and Reverend Johnny Johnson. However, before trial, Defendant recanted his confession. Defendant attributed his confession to his feelings of self-loathing, the fact he just wanted the police to leave him alone, and because he was hoping for the death penalty. At the hearing on the defense's motion to exclude introduction of evidence of Topham's murder at the penalty phase, and in front of the jury, Defendant recanted his confession.
While police investigators thought it was strange that a healthy twelve year old boy would drown in just eighteen inches of water, they concluded Lawrence Topham's death was accidental. According to the police report, dated three days after Topham's death, there was no evidence of a struggle. What appeared to police to be a bruise on Topham's chin was determined by the coroner to be post mortem lividity.
The coroner who actually performed the autopsy on Lawrence Topham also concluded there was no evidence of a struggle and determined his death resulted from accidental drowning. However, Dr. Emil Laga,[6] who qualified as an expert witness in the field of forensic pathology, testified that his review of Topham's autopsy corroborated Defendant's confession. When questioned by defense counsel, Dr. Laga admitted it was also possible that Topham was not the victim of foul play.
In addition to the above evidence, eleven year old Jason Gaspard, who lived in Parro's Trailer Park when Topham died, testified that on the day Topham died, he saw Defendant sitting on the edge of woods at the same time he watched Topham go into the woods.
In the penalty phase of a first degree murder trial, the character of the defendant is automatically at issue, whether or not the defendant has placed his character at issue. State v. Bourque, 622 So.2d 198, 245 (La.1993); State v. Jackson, 608 So.2d 949, *820 953 (La.1992); La.C.Cr.P. art 905.2.[7] This court has held that evidence of unadjudicated crimes is relevant and probative evidence of a defendant's character and propensities in the penalty phase of a first degree murder trial. Jackson, 608 So.2d at 954-56; State v. Brooks (Brooks I), 541 So.2d 801, 813 (La. 1989).
Before evidence of unadjudicated crimes is admissible in the penalty phase of a first degree murder trial, the trial judge must determine: (1) the evidence of defendant's connection with the commission of the unrelated crime is clear and convincing; (2) the proffered evidence is otherwise competent and reliable; and (3) the unrelated crimes have relevant and substantial probative value as to the defendant's character and propensities, which is the focus of the sentencing hearing under La.C.Cr.P. art. 905.2. Brooks I, 541 So.2d at 814. The Brooks I holding was further limited in Jackson "to that [evidence] which involves violence against the person of the victim," and "to that conduct for which the period of limitation for instituting prosecution has not run at the time of the indictment of the accused for the first degree murder for which he is being tried." Jackson, 608 So.2d at 955.
Evidence of Defendant's involvement in the Topham murder is clearly relevant and probative information concerning Defendant's character and propensities. Therefore, the only issue presented is whether Defendant's connection to the Topham murder was proven by clear and convincing evidence which is otherwise competent and reliable.
It is well established in our jurisprudence that an accused may not be convicted of a crime based solely on his own uncorroborated confession without some independent proof that a crime has been committed. State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260, reh'g denied, 515 U.S. 1179, 116 S.Ct. 20, 132 L.Ed.2d 904 (1995); State v. Cruz, 455 So.2d 1351 (La. 1984). The purpose of this corroboration rule is to test the reliability of a confession and thereby prevent an erroneous conviction based solely on an untrue confession. Martin, 93-0285 p.7, 645 So.2d at 195 (citing Warszower v. United States, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876 (1941)). This trustworthiness approach provides the necessary minimum assurance against convictions based on untrue confessions. Martin, 93-0285 p.8, 645 So.2d at 195.
Introduction of a defendant's confession, which is not corroborated by evidence independent of his confession, but is otherwise reliable and trustworthy, at the penalty phase does not have the same repercussions as when it is used as the basis for convicting a defendant of a crime. At the penalty phase, a defendant's guilt is not at issue; rather, the only issue for the jury to decide is what sentence defendant's crime warrants. Therefore, there is no danger that a defendant will be convicted of a crime based solely upon an untrue confession. A defendant's confession, which is uncorroborated by extrinsic evidence independent of his confession, but is otherwise reliable and trustworthy, is assessed by the jury for the sole purpose of evaluating the defendant's character and propensities. The jury's assessment of a defendant's character and propensities assists the jury in determining the appropriate sentence to impose on a defendant.
While we have held the confession-corroboration requirements mandated by Martin and Cruz must be met before an accused may be convicted of a crime, it is not necessary, based upon our discussion above, that the Martin-Cruz corroboration test be met in order to introduce evidence of other crimes at the penalty phase of a trial.[8] Rather, *821 we hold that if the confession is reliable and trustworthy, then it alone may be sufficient to satisfy the clear and convincing evidentiary standard. However, in evaluating the reliability and trustworthiness of a defendant's confession for the admission of it at the penalty phase, one must also consider the circumstances surrounding the confession and the crime to which the defendant confessed. For example, the confession may be unreliable and untrustworthy if it is the product of police coercion or if there is no extrinsic proof that a crime even occurred.[9]
We find the circumstances surrounding Defendant's confession and the death of Lawrence Topham show Defendant's connection with Topham's death by clear and convincing evidence. There is no evidence in the record to suggest Defendant's confession was anything other than voluntary and the product of Defendant's uncoerced free will. State v. Carter, 94-KK-2859 (La.11/27/95), 664 So.2d 367, 385. Defendant maintains he falsely confessed out of a feeling of self loathing and to ensure he would receive the death penalty for the murder of Shane Pullen. However, when asked by police if he was connected to the death of another young boy, Christian Guillotte, Defendant steadfastly denied that he had any involvement in the death of Guillotte.
In addition to his initial confession to police, Defendant also confessed to his attorney, family members, and pastor. While not dispositive to our finding that Defendant's confession is reliable and trustworthy, these subsequent confessions made in a non-custodial setting provide even more evidence to support our conclusion that the confession was voluntary and truthful.
Defendant's confession is corroborated by Jason Gaspard's eye-witness testimony which places Defendant around the scene of Topham's death. Additional corroboration is provided by the testimony of Dr. Laga, who examined Topham's autopsy report. Dr. Laga testified his review of Topham's autopsy report supported a conclusion that Topham may have been choked or strangled by two hands around the neck and then dropped face first into a shallow ditch of water.
Based upon the foregoing, we find Defendant's connection to Topham's murder was proven by clear and convincing evidence which is otherwise competent and reliable. Therefore, the trial judge was not in error by allowing evidence of the Topham murder to be introduced in the penalty phase of Defendant's trial.

SENTENCE REVIEW
Article I, § 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. La.C.Cr.P. art. 905.9 provides that this court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La. Sup.Ct. R. 28, § 1 which provides:
Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and

*822 (c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

(a) Passion, Prejudice or any other Arbitrary Factors
Defendant contends the widespread adverse publicity injected passion and prejudice into his sentencing. We considered this argument in our discussion on the trial judge's denial of Defendant's Change of Venue Motion and found it to be without merit.
Defendant also contends the official policy of the District Attorney's office for the Sixteenth Judicial District which allows the victim's family to decide whether or not to pursue the death penalty interjects an arbitrary factor into the District Attorney's decision on whether to seek the death penalty and skews any attempt to apply the death penalty proportionally. La.C.Cr.P. art. 61 provides, "[s]ubject to the supervision of the attorney general, as provided in Article 62, the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute." In this case, the actions of the District Attorney for the Sixteenth Judicial District did not operate to supersede Defendant's federal or state constitutional guarantees; therefore, his actions and policies will not be disturbed by this court.
Thus, there is no evidence that passion, prejudice or any other arbitrary factor influenced the jury in its recommendation of the death sentence.

(b) Statutory Aggravating Circumstances
The jury in its verdict found the following aggravating circumstances:
(a) the offender was engaged in the perpetration or attempted perpetration of aggravated rape. (La.C.Cr.P. art. 905.4(A)(1)).
(b) the offense was committed in an especially heinous, atrocious or cruel manner. (La.C.Cr.P. art. 905.4(A)(7)).
(c) the victim was under the age of twelve years. (La.C.Cr.P. art. 905.4(A)(10)).
It is undisputed that the victim was under the age of twelve years. It is well-settled that the failure of one statutory aggravating circumstance does not invalidate others properly found, unless introduction of evidence in support of the invalid circumstances interjects an arbitrary factor into the sentencing proceeding. State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995). Evidence concerning whether the offender was engaged in the perpetration or attempted perpetration of aggravated rape when he murdered the victim was presented to the jury during the guilt phase of the trial. In the guilt phase, the jury found Defendant guilty of first degree murder based in part upon their finding that Defendant was engaged in the perpetration or attempted perpetration of aggravated rape when he murdered the victim. During the guilt phase of the trial, the jury was also exposed to the exact manner in which Defendant inflicted the fatal wounds upon the victim. Thus, any evidence introduced in the penalty phase concerning whether the offender was engaged in the perpetration or attempted perpetration of aggravated rape at the time he murdered the victim or any evidence concerning whether the offense was committed in an especially heinous, atrocious, or cruel manner could not have interjected an arbitrary factor into the sentencing proceeding. Therefore, we find it unnecessary to address whether the jury erred in finding the offender was engaged in the perpetration or attempted perpetration of aggravated rape at the time of the offense and that the offense was committed in an especially heinous, atrocious or cruel manner.

(c) Proportionality to the Penalty Imposed in Similar Cases
Federal constitutional law does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nonetheless, La. Sup.Ct. R. 28 § 4(b) provides that the district attorney shall file with this court a list of each first degree murder case tried after January 1, 1976, in the district in which the sentence was imposed. This court reviews death sentences to determine whether the sentence is *823 disproportionate to the penalty imposed in other cases, considering both the offense and the offender.
The State's Sentence Review Memorandum reveals that since 1976, jurors in the Sixteenth Judicial District, have recommended imposition of the death penalty on four occasions.[10] Six other capital prosecutions in the Sixteenth Judicial District resulted in sentences of life imprisonment. However, none of the capital prosecutions in the Sixteenth Judicial District involved the murder of a young child.
Given the scarcity of comparable cases in St. Mary Parish, it is appropriate for this court to look beyond the judicial district in which the sentence was imposed and conduct the proportionality review on a state-wide basis. State v. Percy Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). A state-wide review of cases reflects that jurors find the death penalty appropriate in cases in which the victim is a young child.[11] All of these cases involve murders committed during the commission of aggravated rape, with the exception of Deboue. At trial, the State presented medical evidence consistent with the jury's finding that the victim died during the course of an aggravated rape.
The Uniform Capital Sentence Report and the Capital Sentence Investigation Report indicate Defendant is a white male born on August 8, 1961. He was thirty years old at the time of the offense. Defendant is unmarried and has no children or other dependents. He is the eldest of four children born to John Connolly and Lois Connolly. Defendant's father, who died in 1989, was a severe alcoholic, according to Defendant and Defendant's mother. Defendant was living with his mother in Berwick, Louisiana at the time he murdered Shane Pullen. Defendant has an IQ above 100 and is a high school graduate who attended an electronic vo-tech program. At the time of his arrest, he was employed by Marine Shale, Inc., in Amelia, Louisiana.
Defendant does not have any diagnosed infirmities or maladies. During the penalty phase, the defense elicited testimony from Dr. Marc Zimmerman, a clinical psychologist, that Defendant did not show any signs of organic brain dysfunction or any clinical personality disorder but appeared to suffer from post-traumatic stress syndrome stemming from an incident of sexual abuse occurring when he was twelve years old. In Dr. Zimmerman's opinion, Defendant's anger attacks, in which he would pound on the ground or beat on trees, as he claimed to have done moments before he killed the victim in this case, were attributable to this stress disorder. A psychiatric evaluation performed by the Sanity Commission indicates Defendant was able to distinguish right from wrong and able to adhere to the right. By his own admission, Defendant suffers from recurring emotional problems as a result of an alleged molestation by an acquaintance of his father, when he was an adolescent.
Finally, the Capital Sentencing Investigation Report indicates Defendant has no criminal history. However, he has been charged *824 with the second degree murder of Lawrence Topham, but has not yet been tried for that offense.
After having considered the above factors, we are unable to conclude that imposition of the death sentence in this case is disproportionate to the penalty imposed in similar cases, considering both the crime and the Defendant.
Hence, based upon the above criteria, we do not consider that Defendant's death sentence constitutes cruel, excessive, or unusual punishment.

DECREE
For the reasons assigned, Defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La. R.S. 15:567 until (a) Defendant fails to petition to the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, Defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
TRAYLOR and MARCUS, JJ., concur.
NOTES
[*] Calogero, C.J., not on panel. Rule IV, Part 2, § 3.
[1] The question of whether the victim died during the commission of an aggravated rape was a matter of sharp dispute at trial.
[2] Defendant alleges seven assignments of error, of which four were argued. The three unargued, nonmeritorious assignments of error will be reviewed in an unpublished appendix, as these assignments of error involve only settled principles of law.
[3] La.C.Cr.P. art. 622 provides:

A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending. In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
[4] The following prospective jurors were called on the first panel:

1) Linda M. Madison
2) Betty L. Bergeron
3) Lilia Uze
4) Mickey P. Rogers
5) Luella M. Smith
6) Carolyn Charles
[5] In response to questioning by defense counsel, prospective juror Rogers answered as follows:

Q: So, would that, what she said about being more than one child, would that affect you in any way?
A: No, I really didn't take it to mean  how do I say that. I took what she was saying to mean that it could have happened to more than one child, is how I took it. I didn't take it meaning that he was involved in more than one situation. That's not how I understood it.
Q: Okay. And you would, if you were asked to sit and hear the case, what she said, would that enter, can you put that aside, or do you feel that that would enter in your deliberation at any point?
A: No, sir. That didn't really affect me, what she had said.
[6] At the time of Defendant's trial, the original coroner who had performed the autopsy on Topham was deceased.
[7] La.C.Cr.P. art 905.2(A) provides in pertinent part:

The sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim had on the family members.
[8] We recognized that a different confession-corroboration test may be applied to other crimes evidence introduced at the penalty phase of a trial in State v. Brooks (Brooks II), 92-3331 (La.1/17/95), 648 So.2d 366. Brooks II acknowledged that a criminal defendant cannot be convicted based on his own uncorroborated confession without some extrinsic proof that a crime has in fact been committed. Id. at p. 18-19, 648 So.2d at 376 n. 19 (citing State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190; State v. Cruz, 455 So.2d 1351, 1355 (La.1984)). However, as to the admission of other crimes evidence in a penalty phase, we stated:

Although uncontroverted defense admissions alone might under other circumstances be sufficient to establish the facts by clear and convincing evidence, Brooks' admissions must be considered along with the inability of the police to verify even the occurrence of many of the purported offenses contained in the confession. This circumstance raises the possibility that many of the crimes Brooks claimed he committed never have occurred. Brooks II, 92-3331 p.18, 648 So.2d at 376.
[9] In Brooks II, 92-3331, 648 So.2d 366, we held that the trial court erred in admitting at the penalty phase the part of Brooks' confession which referred to multiple unadjudicated offenses. Our decision was based upon the fact that the State failed to show that any of the crimes Brooks confessed to actually occurred. No victims of Brooks' alleged crimes were found and there were no police reports establishing that such crimes had even occurred.
[10] In State v. Eddie James Sonnier, 380 So.2d 1 (La.1979), this court determined the death penalty was excessive, and remanded the case to the trial court for resentencing to life imprisonment. In State v. Scott Jude Bourque, 622 So.2d 198 (La.1993), this court reversed defendant's death sentence on grounds that a "mini-trial" conducted during the penalty phase with regard to defendant's commission of other crimes interjected an arbitrary factor into the jury's deliberations. However, Bourque was retried and again received the death penalty, and his appeal has been filed in this court.
[11] See State v. Deboue, 552 So.2d 355 (La.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174, reh'g denied, 498 U.S. 993, 111 S.Ct. 541, 112 L.Ed.2d 550 (1990); State v. Copeland, 530 So.2d 526 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860, reh'g denied, 490 U.S. 1077, 109 S.Ct. 2092, 104 L.Ed.2d 655 (1989); State v. Jones, 474 So.2d 919 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992, reh'g denied, 478 U.S. 1032, 107 S.Ct. 13, 92 L.Ed.2d 768 (1986); State v. Brogdon, 457 So.2d 616 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862, reh'g denied, 473 U.S. 921, 105 S.Ct. 3547, 87 L.Ed.2d 670 (1985); State v. Loyd, 489 So.2d 898 (La.1986) (sentenced vacated on grounds of ineffective assistance of counsel at the penalty phase; retrial of Lloyd's sentencing phase is now underway).