760 So.2d 417 (2000)
STATE of Louisiana
v.
Andrew J. HUNDLEY.
No. 99-1156.
Court of Appeal of Louisiana, Third Circuit.
March 22, 2000.
*418 Kim R. Hayes, Assistant District Attorney, Crowley, Louisiana, Counsel for State-Appellee.
J. Rodney Baum, Louisiana Appellate Project, Baton Rouge, Louisiana, Counsel for Defendant-Appellant.
Court composed of Judge JIMMIE C. PETERS, Judge GLENN B. GREMILLION, Judge ELIZABETH A. PICKETT.
GREMILLION, J.
In this case, the defendant, Andrew J. Hundley, appeals his conviction and sentence for the crime of second degree murder. For the following reasons, we affirm.

FACTS
In the early morning hours of July 23, 1997, the partially burned body of fourteen-year-old Terri Pitre was found behind a store in Mowata, Louisiana. At the request of officers from the Eunice Police Department, Defendant was brought in by his parents for questioning. After being advised of and waiving his rights, Defendant confessed to murdering Pitre by hitting her numerous times in the head with a "piece of metal looking board." He admitted that he revisited the crime scene three times, ultimately setting the body on fire to get rid of fingerprints.
Defendant was ultimately charged with the second degree murder of a juvenile, a violation of La.R.S. 14:30.1, to which he entered a plea of not guilty. He filed a motion to suppress his confession, which was denied by the trial court. Defendant then filed a writ application in this court and we affirmed the trial court's ruling. State v. Hundley, 98-731 (La.App. 3 Cir. 8/21/98).
Defendant also filed a Motion to Change Venue. At the hearing on that motion, various news articles and videos were introduced by stipulation of the parties and the record was left open for supplementation of exhibits. The trial court deferred ruling on the motion, at Defendant's request, until it had the opportunity to examine the prospective jurors during voir dire. Trial commenced. Following jury selection, Defendant filed additional exhibits to supplement his Motion to Change Venue, which the trial court denied. Following the trial on the merits, the jury returned a *419 unanimous verdict of guilty. The trial court sentenced Defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. This appeal followed.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant contends the trial court erred in denying his Motion to Change Venue. He claims that the pretrial publicity tainted the jury pool to the extent that it was impossible for him to have a fair trial. Defendant claims the trial court had to go to great lengths to get a jury, and that its failure to grant his challenges for cause as to two jurors demonstrated the taint of pretrial publicity, which made a fair trial impossible.
In support of his Motion to Change Venue, Defendant submitted forty-two newspaper articles and several videotapes of news reports. Most of the reports and articles were factual accounts regarding discovery of the body and the various stages of the prosecution. We note that statements made in those articles regarding Defendant's character were positive. However, there were several newspaper articles which either summarized or quoted statements from his confession.[1]
When the trial court denied Defendant's Motion to Change Venue at the close of jury selection, it noted that the jury was selected and there were only a few members of the general venire who had formed an opinion about the case due to their exposure to pretrial publicity. The trial court also noted that not all of the challenges for cause were based on pretrial publicity and that each side used only eleven of their peremptory challenges.
In State v. Williams, 96-1023 (La.1/21/98); 708 So.2d 703, cert. denied, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998), the supreme court summarized the standard to be applied and the factors to be considered when a motion for change of venue has been denied:
A defendant is guaranteed an impartial jury and a fair trial. La. Const. art. 1, § 16; State v. Brown, 496 So.2d 261, 263 (La.1986); State v. Bell, 315 So.2d 307 (La.1975). To accomplish this end, the law provides for a change of venue when a defendant establishes he will be unable to obtain an impartial jury or a fair trial at the place of original venue. Bell, 315 So.2d at 309. Generally, the defendant bears the burden of showing actual prejudice. State v. Vaccaro, 411 So.2d 415, 424 (La.1982). However, in unusual circumstances, prejudice against the defendant may be presumed. State v. David, 425 So.2d 1241, 1246 (La.1983). Whether the defendant has made the requisite showing of actual prejudice is "a question addressed to the trial court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion." State v. Wilson, 467 So.2d 503, 512 (La.1985), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985). Changes of venue are governed by La. Code Crim.P. art[.] 622, which provides:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.

*420 Several factors are pertinent in determining whether actual prejudice exists, rendering a change in venue necessary, including: (1) the nature of pretrial publicity and the degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. Brown, 496 So.2d at 263; Bell, 315 So.2d at 311. "The length to which the trial court must go in order to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality." Murphy v. Florida, 421 U.S. 794, 803, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975). Because the constitution does not require the defendant be tried by a jury entirely ignorant of his case, the defendant cannot meet his burden by merely showing a general level of public awareness of the case. State v. Thompson, 516 So.2d 349, 352 (La.1987); Brown, 496 So.2d at 263.
Id. at 728.
The supreme court, in Williams, explained that, along with the United States Supreme Court, it often considers the number of jurors excused for cause for having a fixed opinion to determine whether prejudice existed; recognizing from the case law, that it is not clear what level of exposure illustrates a corrupted atmosphere. In Williams, the supreme court considered the number of jurors questioned, how many were familiar with the case, and how many were excused due to their exposure to pre-trial publicity. Of the seventy-one prospective jurors examined in Williams, thirty-three were familiar with the crime and five were excused for their exposure to pre-trial publicity. After comparing these figures to other United States Supreme Court and Louisiana Supreme Court cases,[2] the supreme court concluded the defendant failed to prove he was unable to obtain an impartial jury or a fair trial.
In State v. Wessinger, 98-1234 (La.5/28/99); 736 So.2d 162, cert. denied, ___ U.S. ___, 120 S.Ct. 589, 145 *421 L.Ed.2d 489 (1999), the court used an analysis similar to the one employed in Williams. There the court compared its case at bar with other supreme court cases. Of the sixty-four prospective jurors questioned during voir dire in Wessinger, most knew of the crime, but only five were excused for cause as they had already formed a set opinion about the defendant's guilt. The supreme court ultimately determined the case was more similar to cases in which a change of venue was properly denied.
In this case, a total of sixty prospective jurors were questioned. Almost all of them were aware of the case in varying degrees. Some were simply aware that jury selection was set to begin. To address the change of venue issue, the jurors were questioned in groups of two or three and challenges for cause on the venue issue were conducted separately. During this process, fifteen jurors were excused on challenges for cause based on pretrial publicity. When the jury was empaneled, there remained twelve prospective jurors who had been questioned on the venue issue, but had not yet been subjected to the further questioning during the jury selection process. Defendant used only eleven of its twelve peremptory challenges.
The fact that one-fourth of the prospective jurors were excused for cause based on pretrial publicity is in line with State v. Rodrigue, 409 So.2d 556 (La.1982), appeal after remand, 437 So.2d 830 (La.1983). There a "dry-run" voir dire revealed twenty-six of thirty prospective jurors knew of the case and nine had a set opinion, making a change of venue unnecessary. In Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), twenty of seventy-eight persons questioned were excused for having an opinion about the defendant's guilt. The United States Supreme Court concluded that this ratio "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." Id. at 803, 95 S.Ct. at 2038. By contrast, the instant case can be distinguished from State v. Clark, 442 So.2d 1129 (La.1983), in which the Louisiana Supreme Court found that a change of venue should have been granted. In that case, a "dry-run" voir dire revealed thirty-seven of thirty-eight potential jurors recalled the case and only six of the last twenty-four potential jurors questioned said they could separate their judgment from their prior knowledge of the case.
As support for this assignment of error, Defendant cites the case of Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), where the Supreme Court found the defendant's right to due process was violated and a change of venue should have been granted. In that case, a twenty-minute filmed interrogation of Rideau by the sheriff was broadcast three times over a Lake Charles television station. During the interrogation, Rideau admitted to the bank robbery, kidnapping, and murder. The audiences viewing the film (with sound track) were estimated at 24,000, 53,000, and 20,000; and Calcasieu Parish had a population at that time of approximately 150,000. The Supreme Court noted that three jury members stated on voir dire that they had seen and heard the "interview" at least once and two members of the jury were sheriffs deputies in Calcasieu Parish. The Supreme Court deemed it unnecessary to examine the voir dire transcript because "due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised `interview.'" Id. at 727, 83 S.Ct. at 1420.
Although a thirty-eight-year-old case, Rideau is still cited as authority for the proposition that "the law provides for a change of venue when a defendant establishes that he will be unable to obtain an impartial jury or a fair trial at the place of original venue." See State v. Brumfield, 96-2667 (La.10/20/98); 737 So.2d 660, 677; State v. Craig, 95-2499 (La.5/20/97); 699 *422 So.2d 865, 876, cert. denied, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997); See also State v. David, 425 So.2d 1241, 1246 (La.1983), appeal after remand, 468 So.2d 1126 (La.1984), supplemental opinion, 468 So.2d 1133 (La.1985), cert. denied, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986), where the supreme court stated, "unfairness of a constitutional magnitude will be presumed in the presence of a trial atmosphere which is utterly corrupted by press coverage or which is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob."
In this case, the unfairness does not rise to the level present in Rideau. A case factually similar to the present case was before the supreme court in State v. Comeaux, 514 So.2d 84 (La.1987), appeal after remand, 93-2729 (La.7/1/97); 699 So.2d 16, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998). In that case, the defendant argued that his motions to change venue should have been granted because prejudice existed in the collective mind of the community due to pretrial publicity. At a pretrial hearing, reports from electronic media coverage and newspaper articles were introduced. The articles discussed the defendant's past and present criminal background, including his detention in a juvenile home, and the fact that he was a suspect in a similar rape and beating murder in Hot Springs, Arkansas. One article quoted excerpts from the defendant's confessions. The trial court denied the defendant's motion. The next day, the defendant again requested a change of venue, relying on a newspaper article which had been published that day. The article contained quotes from one of the defendant's statements and referred to the Hot Springs' murder. Again, the defendant's motion was denied. In addressing this issue, the supreme court held:
[W]e conclude that defendant did not meet his burden of proving that there existed such prejudice in the collective mind of the community that a fair trial was impossible. The newspaper articles and other media coverage were neither so extensive nor so inflammatory as to entitle a defendant to a change of venue. Moreover, we note that, as a cautionary measure, the trial judge had the voir dire of prospective jurors conducted in panels of six or fewer so as to carefully screen for prejudicial exposure to publicity surrounding the case. Hence, the trial judge did not err in denying the motions to change venue.
Id. at 90.
In State v. Moseley, 587 So.2d 46 (La. App. 2 Cir.), writ denied, 589 So.2d 1066 (La.1991), on motion of the defendant, his trial was moved from Bossier to Webster Parish. The trial court based its decision on the fact the defendants (Moseley and Widenhouse) and the victim had attended high school in Bossier Parish. The defendant then sought to have his trial moved out of the Shreveport area due to significant media coverage. The trial court denied the motion after the completion of voir dire. The appellate court initially noted that this was not a situation in which prejudice could be presumed because the "extent and nature of the press coverage did not corrupt the trial," there was no "circus atmosphere," and the "proper degree of sobriety and solemnity was maintained." Id. at 52. In their opinion, our colleagues summarized the extent of media coverage as factual in nature and relatively nonprejudicial and found that the pervasiveness of the publicity and its apparent effect was decidedly less in Webster Parish than in Bossier Parish, noting that a much greater percentage of the people in Webster Parish had no opinion of the defendant's guilt or innocence. The appellate court further considered the timeliness and consistency of the coverage before holding that the trial court did not abuse its discretion.
Among other things, the appellate court examined the voir dire conducted in the *423 case. Of the fifty-one prospective jurors questioned, twenty were challenged for cause due to knowledge of the case and the fact they had formed an opinion as to the defendant's guilt or innocence. All challenges for cause were granted by the trial court which allowed the defendant to eliminate any prospective juror who possessed too much knowledge or had already formed an opinion. The defendant used only eleven of his twelve peremptory challenges in selecting the jury plus two more during selection of the alternate jurors. The Second Circuit concluded the defendant had an impartial jury.
The present case is similar factually to Comeaux and Moseley. In this case, very few of the prospective jurors were aware Defendant had made a statement. The trial court either sustained challenges for cause or released, on its own motion, those jurors who had a set opinion about Defendant's guilt or innocence. In certain instances, jurors were questioned individually to prevent any taint to the other prospective jurors. We find that Defendant failed to prove there existed such prejudice in the collective mind of the community that a fair trial was impossible and, accordingly, that the trial court did not abuse its discretion in denying Defendant's request for a change of venue.
Additionally, Defendant alleges that the trial court overruled his challenges of prospective jurors, Regan and Leckelt, despite the fact they failed the test set forth by the supreme court in State v. Goodson, 412 So.2d 1077 (La. 1982). Defendant claims both heard "substantial inflammatory material" about the case and neither were unequivocal in their representations of impartiality.
In Goodson, the defendant sought pretrial review of the trial court's denial of his request for a change of venue. Although there was extensive pretrial publicity in the case, the supreme court found that prejudice could not be presumed because the atmosphere was not utterly corrupted by press coverage. The supreme court instructed the lower court to defer ruling on the defendant's motion until completion of voir dire, offering the lower court the following guidance:
Both the degree of exposure and the prospective juror's testimony as to state of mind are relevant to the determination of acceptability. A prospective juror testifying to an inability to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective juror remembers information that will be developed in the course of the trial, or that may be inadmissible but does not create a substantial risk of impairing judgment, that person's acceptability shall turn on the credibility of testimony as to impartiality. If the formation of an opinion is admitted, the prospective juror shall be subject to challenge for cause unless the examination shows unequivocally the capacity to be impartial. A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to the prospective juror's testimony as to state of mind.
Id. at 1081.[3]
La.Code Crim.P. art. 800 provides:
A. A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling. The nature of the objection and grounds therefor shall be stated at the time of objection.

*424 B. The erroneous allowance to the state of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than it is entitled to by law.
Initially, we note Defendant did not object when his challenges for cause of these jurors were denied. However, we will address this claim in the interest of justice. As noted previously, Defendant did not exercise all of his peremptory challenges. Article 800 was amended in 1983 to delete the requirement that a defendant must exhaust all peremptory challenges before he could seek review of the trial court's denial of a challenge for cause. Thus, a defendant may now complain of the trial court's refusal to sustain a challenge for cause even if he did not exercise all of his peremptory challenges. However, the defendant must be able to show prejudice. State v. Guillory, 97-179 (La. App. 3 Cir. 3/11/98); 715 So.2d 400, writ denied, 98-0955 (La.10/9/98); 726 So.2d 17. In Guillory, the defendant used five peremptory challenges to excuse jurors the trial court would not excuse for cause. On appeal, the defendant contended that the trial court improperly denied the five challenges for cause. We held that the defendant did not show prejudice because he was not forced to accept any juror he did not want and he did not exhaust his remaining peremptory challenges.
The supreme court recently addressed this issue in Wessinger, 736 So.2d 162. In this case, the defendant claimed the trial court erred in denying seven of his challenges for cause. The supreme court stated:
The trial judge's incorrect ruling that deprives a defendant of one of his peremptory challenges is a substantial violation of a statutory or constitutional right and dictates reversal of the conviction and sentence. State v. Bourque, 622 So.2d 198, 225 (La.1993), overruled on other grounds by State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, citing State v. McIntyre, 365 So.2d 1348, 1351 (La.1978). For a defendant to successfully prevail on a claim that he was deprived of one of his peremptory challenges due to the trial judge's erroneous ruling on his challenge for cause, he must show: (1) his challenge for cause was improperly denied; and (2) he has used all of his peremptory challenges. State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683; Bourque, 622 So.2d at 225.
Defendant's peremptory challenge sheet, which is part of the record, shows that he exercised only eight of the twelve peremptory challenges that he is given by La.C.Cr.P. art. 799. Thus, we are not required to reach the issue of whether the trial judge erroneously denied the challenges for cause that are the subject of this assignment of error. See, e.g. State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756, cert denied 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 ("we need not reach the issue of whether the failure to dismiss [prospective juror] Ms. Myers for cause was error because the defense did not use all its peremptory challenges"); State v. Mitchell, 94-2078 (La.5/21/96), 674 So.2d 250 ("In the instant case, we need not reach the issue of whether there was an erroneous denial of defendant's challenge for cause, since the record reveals that defendant failed to use all his peremptory challenges.").
Id. at 178.
In this case, Defendant exercised only eleven of his twelve peremptory challenges, one of which was used to excuse Regan. However, counsel was not forced to use a peremptory challenge on Leckelt. After his challenge for cause as to Leckelt was denied on the venue issue, the panel of jurors was subjected to the typical voir dire examination. Before Leckelt's name was called for challenges, a jury was empaneled. Neither Regan nor Leckelt sat on the jury. Therefore, Defendant suffered no prejudice from the trial court's *425 ruling in this regard, thus, there is no merit in this assignment of error. See La.Code Crim.P. art. 921.

ASSIGNMENT OF ERROR NUMBER TWO
Defendant claims the State failed to show that he knowingly, intelligently, and voluntarily waived his Miranda rights prior to making his statement, under the standard of State v. Fernandez, 96-2719 (La.4/14/98); 712 So.2d 485. In support of his position, he points out that he, although intelligent, was only fifteen years old, was given only five minutes to consult with his father, and three policemen were present when he made his statement. Thus, he contends his statement was not voluntarily and intelligently given. He also claims that he waived his rights before consulting with his father and he was not informed he could retract his waiver. Finally, Defendant notes that the rights waiver purportedly executed by him does not appear on the taped confession, although the detectives investigating the case could easily have put it on the tape.
Some of these issues were addressed in a pretrial writ,[4] wherein Defendant sought reversal of the trial court's ruling denying his motion to suppress. This court found no error in the trial court's ruling.
Although a pre-trial determination of the admissibility of evidence does not absolutely preclude a different decision on appeal, judicial efficiency demands that this Court accord great deference to its pre-trial decisions unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result.
For the following reasons, we find that the previous ruling was neither patently erroneous, nor did it produce an unjust result.
At the suppression hearing, the following testimony was elicited. After receiving information from Martin Bellow, Detective Frederick Clement, of the Acadia Parish Sheriff's Department, and Lieutenant Charles Gant, of the Eunice Police Department, went to Defendant's residence. Vickie Hundley was asked by Lieutenant Gant to bring her son and husband to the police station. According to Detective Clement, Defendant was not considered a suspect at this point. However, Detective Keith Latiola, of the Acadia Parish Sheriff's Office, considered him a suspect. Prior to Defendant's rights being read to him, his mother and father signed the top portion of the Recorded Statement Rights Form as witnesses. Before taking Defendant's confession, Detective Clement informed him of his rights under Miranda by reading the following from the form:
[A]nything that you say can be used against you in a court of law; you have the right to talk to a lawyer for advice before we ask you any questions, and have him or her with you during questioning; if you cannot afford a lawyer, one can be appointed for you before any questioning if you wish; if you decide to answer questions now without a lawyer present, you still have the right to stop answering questions at any time; you also have the right to stop answering questions at any time until you talk to a lawyer.
*426 At the time these rights were read to Defendant, his mother and father were present in the room. Underneath the "rights" section of the form appear the signatures of Defendant, Detective Clement, and Vickie Hundley. Prior to the parties signing the form, Detective Clement filled in the top portion of the form, part of which stated, "The reason for your voluntary statement is as follows: 2nd Degree murder."[5] According to Detective Clements, the "Waiver of Rights" section of the form was read to Defendant in the presence of his father because Defendant asked his mother to leave the room prior to this point. Defendant and his father signed this portion of the form. Detective Clement testified that, between the reading of the rights and waiver of rights, Defendant said "something to the effect that he was the only one that could tell us what had happened to the victim, Terry Pitre." Detective Clement told him to hold off until he had read the waiver of rights section. At this point, Detective Clement went over the Waiver of Rights form with Defendant and his father.
According to Detective Clements and Lieutenant Gant, Defendant asked what was going to happen to him and his family before giving his confession. He also expressed some concern about publicity and the effect it would have on his family and friends. Detective Clement stated that he did not feel he was in a position to answer his questions, so he summoned Lieutenant Wayne Melancon and Detective Latiola to speak to Defendant. The officers answered Defendant's questions telling him that, because of his age, his name would not be released. However, they explained that he could possibly be charged as an adult, but that decision was up to the District Attorney. According to Detective Latiola, Defendant was told that if that happened, his name, his parents' names, and his address could not be withheld from the public.
We note that Defendant was not advised that he could consult privately with his parents; however, before the interrogation began, Defendant asked to be alone with his father for a few minutes and that opportunity was afforded him after his questions were answered by the officers. The officers left the room and waited in the hall for about five minutes. They then reentered the room and Defendant gave a recorded confession.
Detective Clement testified that he did not make any offers or promises to Defendant and that he did not intimidate or threaten him. He said that Defendant appeared calm and did not appear drunk and that his father was present in the room during the entire episode. Detective Clement said, at one point after Defendant started giving the statement, his father asked if he thought he needed a lawyer, and Defendant responded that he did not. Detective Clement was asked if the father allowed him to continue the statement and he responded, "We looked at each other and nothing was said; we continued, sir." At no time did either the Defendant or his father stop the questioning and ask for a lawyer or mention that they were waiting for a lawyer to arrive. They also did not stop at any point during the statement and say they no longer wanted to give a statement.
Defendant testified at trial that his friend Luke killed the victim. According to Defendant, Luke told him not to tell anyone what had happened and if he did, he would "get" him, his parents, and his sister. Defendant testified that Luke told him, "You seen what I did tonight. I can do it again." Thus, to avoid telling the police Luke was the perpetrator, Defendant testified that he lied in his confession to the police and took the blame for the murder. Further, Defendant testified that he was alone with his father for less than *427 five minutes and that when he asked the officers what could happen to him, they said it was up to the District Attorney. He claims that he could not remember what was written on the waiver form, but that he "just wanted to sign those papers and get it over with."
At the time of Defendant's confession and the suppression hearing, State in the Interest of Dino, 359 So.2d 586 (La.1978), cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978) set forth the requirements to be met before a valid confession could be obtained from a juvenile:
For these reasons we hold that in order for the State to meet its heavy burden of demonstrating that a waiver is made knowingly and intelligently, it must affirmatively show that the juvenile engaged in a meaningful consultation with an attorney or an informed parent, guardian, or other adult interested in his welfare before he waived his right to counsel and privilege against self-incrimination.
Accordingly, the purported waiver by a juvenile must be adjudged ineffective upon the failure by the State to establish any of three prerequisites to waiver, viz., that the juvenile actually consulted with an attorney or an adult before waiver, that the attorney or adult consulted was interested in the welfare of the juvenile, or that, if an adult other than an attorney was consulted, the adult was fully advised of the rights of the juvenile.
Id. at 594 (footnote omitted).
Approximately one month after the suppression hearing in this case, the Louisiana Supreme Court, in Fernandez, 712 So.2d 485, overruled Dino, returning to the "totality of the circumstances" standard in effect prior to the time Dino was decided. The court held:
A confession by a juvenile given without a knowing and voluntary waiver can be, and should be, suppressed under the totality of circumstances standard applicable to adults, supplemented by consideration of other very significant factors relevant to the juvenile status of the accused. While law enforcement officers would do well to continue to follow the Dino procedure in order to insure the validity of a confession by a juvenile, a prophylactic rule imposing these requirements as an absolute standard is not appropriate.
Id. at 489-90.
A similar situation came before this court in State v. Green, 98-1388 (La.App. 3 Cir. 3/31/99); 735 So.2d 723. In that case, a discussion of the issue of whether Fernandez should be retroactively applied was pretermitted because we found the lesser standard of Fernandez was satisfied when the mandates of Dino were met. In Green, the defendant's aunt was present during his interrogation and she advised him to tell the truth. The defendant and his aunt were advised of his rights and indicated that they understood. Consequently, we found the requirements of Dino were satisfied.
The Dino standard was employed by the supreme court in State v. Hudson, 404 So.2d 460 (La.1981). In that case, the defendant claimed he was interrogated without a prior consultation with an attorney or informed adult, as required by Dino. After several incriminating items were located in the defendant's home, the defendant and his parents went to the police station and the defendant was advised of his Miranda rights in the presence of his parents. The defendant stated he understood his rights and he signed a card waiving those rights. The officers questioned the defendant about the victim's disappearance and the defendant's parents insisted that he cooperate and tell the truth. The defendant denied being involved in the murder, but he eventually took the police to the place where the victim's body was found.
Upon returning to the police station, the defendant was again advised of his Miranda warnings in the presence of his parents. He was told he could stop the *428 questioning at any time and that any statement should be completely voluntary. The defendant indicated he understood the officer's explanation and he wished to talk about the incident. He then proceeded to place the blame for the victim's death on another person. As the investigation progressed, one of the investigators returned to question the defendant again. The defendant was advised of his rights in the presence of his parents, and again he placed the blame on another person. The investigator told the defendant he did not believe him and he asked if the defendant would like some time to talk with his parents alone. The defendant responded that he would. Once the defendant was alone with his parents, they urged him to tell the truth. Approximately ten minutes later, the investigator returned and the defendant admitted to killing the victim in the face of threats to himself and his family.
In Hudson, the supreme court first noted some members of the court felt the standards employed in Dino were not constitutionally required; however, the court found it was not necessary in that case to determine whether to return to the "totality of the circumstances" standard. The court noted Dino involved a confession by a very young (thirteen-year-old) child who was not afforded a meaningful consultation with his parents. Additionally, the court noted Dino was questioned outside the presence of his mother although she was available to sit in during the questioning. The following discussion formed the basis for the court's holding:
Here, defendant was a 16-year old high school senior whose rights had been thoroughly explained to him in the presence of his parents, who heard and apparently understood the explanation.[6] His choice to speak about his offense was clearly knowing and voluntary.[7] Defendant's parents, after listening to the explanation of his rights, gave him the proper moral advice to tell truthfully all that he knew about the murder. There is no reasonable doubt about the voluntariness, reliability or the probative value of defendant's inculpatory statement.
Finally, the purpose of the Dino standards is to insure that statements by a juvenile are reliable and voluntary, and the statement in this case is clearly not violative of that purpose. We hold that the prophylactic exclusionary rule of Dino (whatever its merits in cases of very young, unsophisticated children questioned out of the presence of their parents) does not require the exclusion of an inculpatory statement by a juvenile who, as in this case, was capable of intelligently waiving his rights, was questioned in the presence of his parents (who were of normal intelligence and who heard the explanation of rights), and was afforded an opportunity to consult privately with his parents before making the statement.
Id. at 464 (footnote omitted).
In a footnote, the court stated:
Defense counsel contends that defendant's consultation with his parents was inadequate, since his parents did not tell him, for example that he could be prosecuted as an adult or that he could go to prison for life if he incriminated himself.
In determining the admissibility of a juvenile's confession given after consultation with his parents, a court should not base its determination on whether a criminal defense attorney would have given different advice than the parents gave. If parents' advice to tell the truth requires exclusion of a juvenile's confession, then virtually no guilty juvenile will *429 ever be convicted on a confession given after consultation with parents. The proper inquiry is whether the presence of and consultation with a concerned adult resulted in a voluntary and reliable statement. Moreover, Dino's requirement of the presence of an adult interested in the juvenile's welfare was certainly met in this case.
Id. at 464, n. 7.
On application for rehearing, the court noted:
Although we conclude that the trial judge was justified in finding that the requirements of Dino were complied with by the police officers, it should be noted that this case barely passes muster on the question of whether the juvenile was given an opportunity to engage in a meaningful consultation with his informed parents before he waived his right to counsel and privilege against self-incrimination. The police officers testified that the juvenile and his parents were fully informed of the juvenile's rights in the presence of each other before interrogation commenced, but they did not testify that the juvenile was allowed an opportunity to confer with the parents before he actually waived his rights. However, the juvenile's mother testified that she talked with her son privately after the rights had been explained to him for maybe a minute before the questioning [commenced]. The father testified that he conferred with his son at about the time the son was advised of his constitutional rights in his presence, and that this conversation could have occurred after the Miranda warnings and explanation, but that he could not be sure. Although the question is extremely close, we ultimately conclude that there is sufficient evidence in the record to sustain the trial judge's ruling.
Id. at 466.
We find that this case is in line with those cases in which this court and the supreme court found the Dino requirements were satisfied. Defendant and his parents were informed of his rights and the waiver of rights was later explained to Defendant in the presence of his father. They indicated they did not want an attorney. Although Defendant's consultation with his father occurred after the waiver was executed, it preceded his confession. He indicated to Detective Clement that he understood his rights and the waiver of rights. Additionally, there is no indication in the record that Defendant's confession, although made in the presence of several officers, was coerced in any way. By finding that the requirements of Dino were met in this case, we need not decide whether Fernandez should be retroactively applied.
As we previously noted, Defendant contends the waiver of rights does not appear on the taped confession. Defendant cites no authority and we are not aware of any law requiring waivers to be tape recorded. The waiver of rights was explained to Defendant and the form was signed by Defendant, his father, and Detective Clement, who indicated that Defendant understood his actions. There is no merit to this argument.
Finally, Defendant argues the State did not prove that he was informed he could retract his waiver. This argument is factually incorrect. As discussed previously, he was informed by Detective Clement that if he decided to answer questions without a lawyer present, he could stop at any time and request a lawyer. Again, we are aware of no authority requiring interrogating officers to inform anyone that they can retract a waiver and Defendant cited none. We, therefore, find this assignment of error without merit.

ASSIGNMENT OF ERROR NUMBER THREE
Defendant contends his sentence constitutes cruel and unusual punishment because the offense for which he was convicted was the act of a fifteen-year-old *430 child. He notes that the courts, relying on Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), have held mandatory life sentences are validly imposed on fifteen-year-old defendants as a group. However, he argues that the Supreme Court has held the Eight Amendment prohibition against cruel and unusual punishment prohibits the death penalty being imposed on persons who are under sixteen at the time of the commission of the offense. Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988).
Defendant did not file a Motion to Reconsider Sentence, but did object and assign as error regarding the sentencing provision, "wherein someone over the age of fourteen but still a juvenile can be sentenced and serve a sentence past his birth-date as being unconstitutional both under the United States Constitution and the constitution of the State of Louisiana."
Our colleagues on the Second Circuit have discussed the standard to be applied in cases such as this in State v. Pilcher, 27,085, pp. 12-13 (La.App. 2 Cir. 5/10/95); 655 So.2d 636, 643, writ denied, 95-1481 (La.11/13/95); 662 So.2d 466:
The Eighth and Fourteenth Amendments to the U.S. Constitution and Article I, Sec. 20 of the Louisiana Constitution prohibit the imposition of a penalty that is cruel and unusual. In Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the United States [S]upreme Court overturned a life sentence ordered to be served without benefit of parole, probation or suspension of sentence, imposed upon a defendant convicted for the seventh time for felony check fraud. In so holding, the Court stated:
In sum, we hold as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted. Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals. But no penalty is per se constitutional.
The Court went on to state that whether a given sentence is proportional to a crime depends upon:
[O]bjective criteria, including (I) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.
The Louisiana Supreme Court in State v. Foley, 456 So.2d 979 (La.1984), conducted this analysis of the mandatory life-without-benefit sentence imposed on a 15-year-old convicted of aggravated rape and determined that the harsh sentence nevertheless did not violate the Eighth Amendment.
The U.S. Supreme Court has recently modified Eighth Amendment standards in favor of the states. In Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the Court held that the Solem v. Helm analysis was only required in cases where the sentence imposed was "grossly disproportionate" to the offense.[8]
The Second Circuit stated, that generally, life sentences for second degree murder do not violate the Eighth Amendment and it is not facially unconstitutional to apply such a sentence to a fifteen-year-old convicted of second degree murder. Before reaching the proportionality analysis pursuant to Harmelin, the court was required to decide whether the sentence imposed *431 was grossly disproportionate to the offense. The court decided it was not.
Likewise, we find that Defendant's sentence is not grossly disproportionate to the offense. His confession reveals he struck Pitre in the back of the head with a "piece of metal looking board" after he "had enough" of her insults. Defendant chose to continue hitting her because he was afraid that he would be in trouble if he took her to the hospital. After striking her numerous times in the back of the head, Defendant dragged her behind a shed and covered her with a tarp. He then went home, but claimed he returned to the scene with the intent of bringing her to the hospital. However, he once again returned home. Not wanting Pitre to have to live as a "vegetable" if she survived, he decided to cut either her wrist or throat with a knife he retrieved from his house. After attempting to cut the victim's wrist and realizing that he "just couldn't do it," he returned to his house again. After considering ways to keep himself out of trouble, Defendant decided to set Pitre's body on fire to get rid of any fingerprints and so that the injured parts of her body would not look as gruesome.
Considering this was a senseless murder, life imprisonment without the benefit of parole, probation, or suspension of sentence does not shock our sense of justice, nor is it grossly disproportionate to the offense committed. This assignment of error has no merit.

SUPPLEMENTAL ASSIGNMENT OF ERROR
By this assignment of error, Defendant contends it was improper for the State to file into evidence its discovery responses, which included a transcript of Defendant's confession, prior to the trial court's ruling on the confession's admissibility. Defendant bases this claim on the fact that the trial judge read the statement prior to the suppression hearing, which prejudiced Defendant because "human nature being what it is, that the court was probably shocked and repulsed by the contents of that confession."
Although this issue was raised in Defendant's pretrial writ application which we denied, we will briefly address this argument. The trial judge admitted he read the confession prior to the hearing. He explained that he discovered the confession while searching the file for a brief in support of the motion to suppress. The trial judge stated that he did not see how this could have prejudiced Defendant, nor can we. Further, Defendant has cited no statute or rule preventing the filing of the responses to discovery, nor can we find any. Finally, there is nothing in the record which even slightly indicates the trial judge was prejudiced by reading the confession prior to the hearing, which he would have done as part of the suppression hearing. This assignment of error is without merit.

CONCLUSION
Defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] November 1, 1998 article in The Eunice News; July 5, 1998, October 25, 1998 and February 22, 1999 articles in the Daily World; February 21, 1999 article in The Sunday Advertiser; February 23 and 24, 1999 articles in The Daily Advertiser; and February 23, 1999 article in the Crowley Post Signal.
[2] The supreme court in Williams, 708 So.2d at 728-29, noted the following:

Murphy, 421 U.S. at 803, 95 S.Ct. at 2037 (that 20 of the 78 venire persons were excused because of their opinion about defendant's guilt "may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own."); see also, State v. Connolly, 96-1680, p. 5 (La.7/1/97), 700 So.2d 810, 815 (although 86.33% (120 out of 139) potential jurors possessed some knowledge about the crime, most had only a vague recollection of the surrounding facts, and thus a change of venue was not required); State v. Wilson, 467 So.2d 503, 513(La.), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985) ("Although a majority of prospective jurors (i.e. 24 of 39), admitted exposure to pretrial publicity, only four were excused for cause on ground of their formation of a fixed opinion.... A review of the responses of the potential jurors on voir dire does not reveal the existence of collective community prejudice which could have denied defendant a fair trial before impartial jurors."); State v. Rodrigue, 409 So.2d 556, 559 (La.1982) (In a mock voir dire set up in order to determine the impact of media coverage by the Court, 26 of 30 prospective jurors had read or heard about the case, but only 9 had formed an opinion as to the defendant's guilt.); State v. David, 425 So.2d 1241, 1246 (La.1983) (Out of 112 jurors, 27 had read or heard about the case, but only six had an opinion, and four jurors said they could put their opinion aside). Compare, State v. Clark, 442 So.2d 1129, 1133 (La.1983) (motion for change of venue granted based on dry run voir dire in which 37 of 38 jurors recalled details of crime and only 6 out of 24 jurors in the last two groups questioned indicated their knowledge would not affect their decision).
[3] The defendant in Goodson later appealed his conviction, claiming the trial judge erred in denying three challenges for cause. The appellate court found the trial court had followed the guidelines it set and had not erred in denying the various challenges for cause. See Goodson, 437 So.2d 1174.
[4] In State v. Hundley, an unpublished writ opinion bearing docket number 98-00731 (La.App. 3 Cir. 8/21/98), Defendant claimed his confession was not intelligently and knowingly made. Specifically, he argued the requirements of State in the Interest of Dino, 359 So.2d 586 (La.1978), cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978), were not met because the consultation with his father occurred after he waived his rights. He additionally argued that he was not informed by the officers that he could revoke his waiver of rights. Defendant alternatively argued that even if the standard set forth in State v. Fernandez, 96-2719 (La.4/14/98); 712 So.2d 485 (decided one month after the suppression hearing) applied to his case, the confession was still not voluntary.
[5] Detective Clement testified that he struck out the words "arrest" and "detention" before the words "voluntary statement."
[6] Defendant's mother had gone to the twelfth grade and his father to the eighth grade.
[7] The presence of the juvenile's parents helps to assure the voluntary nature of a confession. The presence of parents should prevent any sort of overbearing or abusive police conduct. No such coercive behavior is even alleged to have occurred here, and there is no dispute regarding the voluntariness of defendant's confession.
[8] We note that in Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the Supreme Court stated that its decision in Solem was wrong and the Eighth Amendment contained no proportionality guarantee.