# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

### 13-398

**STATE OF LOUISIANA**

**VERSUS**

**BRIAN SEGURA**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 11-866
HONORABLE LORI ANN LANDRY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

**Hon. J. Phillip Haney**
**District Attorney, Sixteenth Judicial District Court**
**Angela B. Odinet**
**Assistant District Attorney**
**415 Main St.**
**St. Martinville, LA 70582**
**(337) 394-2220**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Susan K. Jones**
**Attorney at Law**
**12320 Louisiana Highway 44, Bldg 4 Suite B**
**Gonzales, LA 70737**
**(225) 647-9673**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Brian Segura**

**Stephen J. Haedicke**
**The Law Offices of Stephen J. Haedicke, LLC**
**639 Loyola Ave. #1820**
**New Orleans, LA 70113**
**(504) 525-1328**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Brian Segura**

**Edward J. Marquet**
**Louisiana Appellate Project**
**P.O. Box 53733**
**Lafayette, LA 70505-3733**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Brian Segura**

**GREMILLION, Judge.**

Defendant, Brian Segura, was charged by grand jury indictment with two counts of aggravated kidnapping, violations of La.R.S. 14:44, and one count of armed robbery, a violation of La.R.S. 14:64. At the sentencing hearing, the State summarized its charges as follows:

> [Defendant] victimized a young mother and her young child, kidnaped them at knifepoint, tied the mother up, [and] robbed them of money that she was supposed to withdraw from the ATM machine.

On October 6, 2011, four days before the trial, the local newspaper, *The Daily Iberian,* ran a disparaging story about Defendant. On the same day, a local television station, KATC, ran several segments derivative of the newspaper article. On October 7, 2011, Defendant filed a "Motion for Change of Venue on Basis of Pretrial Publicity." Subsequently, on October 10, 2011, Defendant filed a "Motion for Individual Sequestered Voir Dire on Publicity." On that same date, the trial court heard argument and testimony regarding the motion for change of venue.

The trial court, however, decided to rule on the motion for change of venue after the jurors were questioned individually during voir dire. After jury selection, the trial court denied the motion for change of venue, noting that a jury had been selected.

Defendant was found guilty as charged and was sentenced to life imprisonment at hard labor without benefits on each count of aggravated kidnapping and fifty years at hard labor without benefits on the armed robbery conviction. The trial court ordered the sentences to run concurrently with one another, but consecutively to sentences imposed against Defendant in Iberia and Lafayette Parishes as well as any other sentence Defendant was currently serving.

Defendant assigns two errors, both of which spring from the pretrial publicity. Namely, he complains of the trial court's denial of his motion to change venue and the trial court's denial of several juror challenges for cause.

## CHANGE OF VENUE

Defendant argues that he was denied the right to a fair trial by the trial court's refusal to grant his motion for change of venue. The jury pool, Defendant argues, was "irrevocably tainted through intensive media coverage of his alleged crimes shortly before trial." Defendant asserts that he introduced three media items that appeared in the local press in the four days before his trial began on October 10, 2011.

First, the defense introduced an article that appeared in the *Daily Iberian* on Thursday, October 6, 2011 entitled "Murder Confession." After recounting details of the seven-year-old murder of Carrie Billeaud, the newspaper article quoted Iberia Parish Sheriff, Louis Ackal, as stating that Defendant finally cooperated in the murder investigation of Billeaud when he was threatened with the "needle." Before that time, Defendant had led the detectives to several "ghost locations" in search of evidence, costing the parish about $136,000 in materials and labor. Once Defendant finally cooperated, detectives located the baseball bat used in the murder as well as the stolen money bags inside a shed belonging to Defendant's mother. The newspaper article also quoted Sheriff Ackal as stating that Defendant admitted to killing Billeaud, and admitted to thinking of killing the woman that he kidnapped (but did not because of the child in the car). The newspaper article also quoted Sheriff Ackal's statement that Defendant was the ringleader of an incident in jail wherein a deputy was taken hostage and stabbed. According to Sheriff Ackal, Defendant admitted to wanting to kill the deputy.

Second, Defendant introduced clips from several KATC news segments that aired on October 6, 2011. In the clips, KATC quoted Sheriff Ackal's statement in the *Daily Iberian* regarding Defendant's confession to the Billeaud murder, posted a picture of Defendant, quoted Sheriff Ackal as stating that Defendant was a person of interest in the Billeaud murder, and stated that Sheriff Ackal denied the interview with the *Daily Iberian*. In one of the segments, KATC also mentioned that Defendant was involved in a hostage situation at the jail and that Defendant would be going to trial the following Monday on aggravated kidnapping and armed robbery charges. Finally, KATC stated that no arrests had been made in the Billeaud murder and showed footage of one of Billeaud's relatives crying because of her death.

Lastly, Defendant introduced an article that was printed on Sunday, October 9, 2011, in the *Daily Iberian* newspaper. This article stated that Defendant's attorney had filed a motion for change of venue because of the inflammatory remarks made by Sheriff Ackal and the District Attorney, which were printed in the *Daily Iberian* and reported by KATC. The Sunday article mentioned Sheriff Ackal's statement, printed in the Thursday article, that Defendant confessed to the Billeaud murder. The Sunday article also mentioned the facts surrounding the present charges of aggravated kidnapping and armed robbery, as well as the hostage and stabbing incident at the Iberia Parish Jail. Notably, while Defendant introduced this article in support of the motion for change of venue, defense counsel stated that "It is not our inclination that the article printed in the Sunday paper tainted the jury."

Thus, we are left to consider the possible effects of a single newspaper article and several T.V. news segments, all of which derived from that newspaper

article, and all of which were broadcast on a single day very shortly before the jury was selected.

In a recent case, the Louisiana Supreme Court set forth the law regarding a change of venue:

> The right to an impartial jury and a fair trial is guaranteed to every defendant. *See* La.Const. art. I, §16; *State v. Sparks*, 88-0017, p. 15 (La. 5/11/11), 68 So.3d 435, 456, *cert. denied*, ___ U.S. ___, 132 S.Ct. 1794, 182 L.Ed.2d 621 (2012); *State v. Lee*, 05-2098, p. 32 (La. 1/16/08), 976 So.2d 109, 132; *State v. Bell*, 315 So.2d 307, 309 (La.1975). To effect this guarantee, the law provides for a change of venue when a defendant establishes that he or she will be unable to obtain an impartial jury or a fair trial at the place of original venue. *Sparks*, 88-0017 at 15, 68 So.3d at 456; *Lee*, 05-2098 at 32, 976 So.2d at 132; *Bell*, 315 So.2d at 309.

> Changes of venue are governed by La.C.Cr.P. art. 622, which provides:

>> A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.

>> In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.

> In exceptional circumstances, prejudice against a defendant may be presumed. *See State v. David*, 425 So.2d 1241, 1246 (La.1983) ("[U]nfairness of a constitutional magnitude will be presumed in the presence of a trial atmosphere which is utterly corrupted by press coverage or which is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob.") Otherwise, it is the defendant's burden to demonstrate actual prejudice. *State v. Manning*, 03-1982, p. 7 (La. 10/19/04), 885 So.2d 1044, 1061; *State v. Vaccaro*, 411 So.2d 415, 423-24 (La.1982).

*State v. Magee*, 11-574, pp. 10-11 (La. 9/28/12), 103 So.3d 285, 298, *cert. denied*, __U.S. __, __ S.Ct. __ (2013).

4

In *State v. Connolly*, 96-1680 (La. 7/1/97), 700 So.2d 810, the supreme court found the trial atmosphere not utterly corrupted by press coverage when two newspaper articles recounted the basic facts surrounding the crime, and one newspaper article mentioned the fact that the defendant was involved in another murder.  Additionally, details concerning the murder for which the defendant stood trial were aired on radio and television.  *Connolly* differs from the present case in that the articles in *Connolly* were printed several months to a couple of years prior to trial.  The articles in the present case were printed only a few days before trial.

Despite this distinction, we do not presume prejudice in the present case.  The supreme court in *Magee* did not presume prejudice despite the fact that the media coverage in *Magee* resumed in the days immediately preceding Magee's trial.  Furthermore, in *State v. Lee*, 05-2098 (La. 1/16/08), 976 So.2d 109, *cert. denied*, 555 U.S. 824, 129 S.Ct. 143 (2008), the Louisiana Supreme Court did not presume prejudice in a case where the defense introduced thousands of print and media stories regarding the search for the South Louisiana Serial Killer, including media stories that covered Lee's conviction in another case.  The media coverage in the present case, like the media coverage in *Connolly, Lee,* and *Magee*, did not utterly corrupt the trial atmosphere.

We did, however, compare *Connolly, Lee,* and *Magee* to *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417 (1963), where prejudice was presumed when Rideau's twenty-minute "confession" was aired three times on television in the community where the crime and trial took place, and *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628 (1965), where trial was conducted in a circus atmosphere with members of the press being allowed to sit within the bar of the court and overrun the courtroom with television equipment.  The distinctions we discerned from our

5

comparison are obvious and manifest. They serve only to confirm our decision not to presume prejudice.

Without the presumption of prejudice, Defendant has the burden to demonstrate actual prejudice. *See Magee*, 103 So.3d 285. The Louisiana Supreme Court set forth the following criteria that must be met for the defendant to meet his burden of proving actual prejudice:

> To meet this burden, a defendant must prove more than mere public knowledge or familiarity with the facts of the case: he must demonstrate the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case. *State v. Clark*, 02-1463, p. 18 (La. 6/27/03), 851 So.2d 1055, 1071; *State v. Frank*, 99-0553, p. 14 (La. 1/17/01), 803 So.2d 1, 15. A defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue simply by showing a general level of public awareness about the crime; rather, he must show that there exists such prejudice in the collective mind of the community that a fair trial is impossible. *Clark*, 02-1463 at 17, 18, 851 So.2d at 1070, 1071. Whether a defendant has made the requisite showing of actual prejudice is a question addressed to the district court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion. *Sparks*, 88-0017 at 16-17, 68 So.3d at 457; *Lee*, 05-2098 at 33, 976 So.2d at 133; *Clark*, 02-1463 at 17, 851 So.2d at 1071.

> In *Bell, supra,* this court enumerated several factors relevant to the district court's determination of whether to order a change of venue. These factors include: (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. *Bell*, 315 So.2d at 311. In setting out these factors, this court emphasized that in deciding whether to change venue, the district court must extend its focus beyond the prejudices and attitudes of individual venire persons. The defendant must be allowed to show that, even if it would be possible to select a jury whose members were not subject to a challenge for cause, prejudice or influences exist within the community at large that would affect the juror's answers during voir dire or the witnesses' testimony, or that for any other

> reason, a fair and impartial trial could not be obtained in that venue. *Clark*, 02-1463 at 16-17, 851 So.2d at 1070; *Bell*, 315 So.2d at 313. The district court's ultimate determination must rest on the community's attitude toward the defendant. *Clark*, 02-1463 at 17, 851 So.2d at 1075.
>
> In reviewing a denial of change in venue, the primary task of the court is to inquire as to the nature and scope of publicity to which prospective jurors in a community have been exposed and examine the lengths to which a court must go to impanel a jury that appears to be impartial in order to ascertain whether prejudice existed in the minds of the public which prevented the defendant from receiving a fair trial. *Clark*, 02-1463 at 18, 851 So.2d at 1071. In performing this review, courts must distinguish largely factual publicity from that which is invidious or inflammatory, as the two present real differences in the potential for prejudice. *Id.* While, ultimately, there is no bright line test for ascertaining the degree of prejudice existing in the collective mind of the community, the seven *Bell* factors help facilitate the inquiry. *Sparks*, 88-0017 at 18, 68 So.3d at 457; *Frank*, 99-0553 at 16, 803 So.2d at 16. In addition, courts have examined the number of jurors excused for cause for having a fixed opinion as another gauge of whether prejudice exists in the public mind. *Clark*, 02-1463 at 18, 851 So.2d at 1071; *Frank*, 99-0553 at 15, 803 So.2d at 15.

*Id.* at 298-99. After considering each of the *Bell* factors, the court in *Magee* found

no abuse of discretion in the trial court's denial of Magee's motion for change of

venue. Following the supreme court's example in *Magee*, we will address the

applicability of each of the *Bell* factors to the present case.

*Nature and Degree of Publicity*

As discussed above, Defendant introduced two newspaper articles and clips

of several news segments from KATC in support of his motion for change of

venue. In addition to claiming that the substance of both the newspaper article and

the news segments were "highly inflammatory and particularly invidious,"

Defendant argues that if such other crimes had been mentioned during the course

of his trial, the Code of Criminal Procedure would have mandated an automatic

mistrial. However, as the United States Supreme Court stated in *Murphy v.*

7

*Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2036 (1975), "juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone" do not presumptively deprive the defendant of due process. Rather, the "totality of circumstances" must be examined to determine whether the defendant received a fair trial. *Id. See also Connolly*, 700 So.2d 810, where the supreme court did not presume prejudice simply because a newspaper article mentioned the fact that Connolly was involved in an unrelated murder.

Some of the information printed in the newspaper and aired on KATC was emotionally charged. However, even though the supreme court in *Magee* found some of the information employed by the media in that case emotionally charged, the inquiry did not end. The supreme court then looked to the record of the voir dire examination: "[T]he record demonstrates that of the 63 prospective jurors examined concerning their familiarity with the case, approximately 43% responded they had some exposure to it." *Magee*, 103 So.3d at 300. In the present case, of the sixty prospective jurors examined, twenty-four jurors (40%) responded that they had some exposure to the case prior to trial.[1] Discussing the 43% of jurors exposed to the case in *Magee*, the supreme court stated the following:

> This percentage is comparable to, and in some instances considerably smaller than, that present in other cases in which this court has found no abuse of discretion in a district court ruling denying a motion for change of venue based on the number of prospective jurors familiar with the facts of the case. *See, e.g., Lee*, 05-2098 at 34, 976 So.2d at 133 (123 of 125 prospective jurors (98.4%) were "at least vaguely familiar" with the case through media accounts or informal private conversations); *Clark*, 02-1463 at 21, 851 So.2d at 1073 (78 of 124

---

[1]Defendant asserts that there were sixty-eight prospective jurors in the jury pool. At trial, the State asserted that there were sixty-two prospective jurors. According to the roll call of the separate panels, four panels totaling sixty-nine jurors were called. However, we counted only sixty prospective jurors as actually being called for examination.

venire members (62.9%) responded that they had "some exposure" to the case); *Frank*, 99-0553 at 16-17, 803 So.2d at 16-17 (110 of 113 venire members (97.3%) had been exposed to "some kind of publicity surrounding the case" while 89% of the prospective jurors indicated that they had been exposed to information about the case on more than one occasion or from multiple sources); *State v. Hoffman*, 98-3118, p. 9 (La. 4/11/00), 768 So.2d 542, 555 (72 of 90 prospective jurors (80%) "had awareness of the case before trial"); *State v. Connolly*, 96-1680, p. 5 (La. 7/1/97), 700 So.2d 810, 815 (although 120 of 139 potential jurors (86.33%) possessed some knowledge of the crime, most had only a vague recollection of the surrounding facts).

*Magee*, 103 So.3d at 300-01. Likewise, the 40% of jurors exposed to pre-trial coverage in the present case is comparable to, and in most cases considerably smaller than, the percentage present in other cases wherein the supreme court found no abuse of discretion in the denial of a motion for change of venue.

In *Magee*, the supreme court further noted:

> Moreover, of the 27 prospective jurors who expressed some knowledge of the case, most had only a vague recollection of the events, consisting largely of factual information, *i.e.,* that the incident arose out of a domestic dispute and involved the shooting of the accused's wife and children. And, those who actually served on the jury assured the court they would be able to decide the case based solely on the evidence presented at trial.

*Id.* at 301. Applying this same analysis to the present case, we note that of the twenty-four prospective jurors who expressed some knowledge of the case, fifteen expressed only a recollection of media coverage or Defendant's involvement in the kidnapping, Billeaud murder, and jail hostage situation. Five of those jurors heard about the case through conversations with other people and not by reading the newspaper or watching the news. Only nine of the sixty jurors admitted to knowing details of the pertinent events or expressed concern with being able to put their knowledge aside. None of these nine jurors served on the jury.

Each of the twenty-four prospective jurors who expressed some knowledge of the case through pre-trial exposure was questioned individually by the trial

court, the State, and the defense.  The trial court excused six of the sixty prospective jurors (10%) because of their exposure to pre-trial publicity about the case.  This court has recognized that the number of jurors excused for cause due to having a fixed opinion because of pre-trial publicity is a factor to be considered in determining whether prejudice existed.  *State v. Hundley*, 99-1156 (La.App. 3 Cir. 3/22/00), 760 So.2d 417.  In *Hundley*, fifteen of sixty prospective jurors (25%) were excused for cause based on pre-trial publicity.  The court in *Hundley* found that this percentage was "in line" with other cases wherein a change of venue was unnecessary.  *Id.* at 421.  In one such case, *Murphy*, 421 U.S. at 803, the United States Supreme Court found that a percentage of 26% (twenty of seventy-eight) of prospective jurors excused for having an opinion about the defendant's guilt "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own."  Likewise, the 10% of jurors excused because of their exposure to pre-trial publicity in the present case does not suggest a community with sentiment poisoned against Defendant.

The trial court denied six of the challenges for cause made by Defendant because of a juror's exposure to pre-trial publicity.  As discussed in the next assignment of error, however, all of these jurors, including the two that ended up serving on the jury, indicated that they could be fair and had not formed an opinion about Defendant's guilt or innocence.

*Connection of Government Officials with Publicity*

As to this factor, we must agree with Defendant.  Upper-level Iberia Parish officials were clearly connected with the newspaper article.  It is beyond doubt that two of the reporter's sources were the Iberia Parish Sheriff and the Sixteenth

10

Judicial District Attorney. In addition, the reporter spoke with the public information officer for the sheriff's office more than once in connection with his story. At the hearing, the reporter, Patrick Flanagan, stood by his story and the quotes therein.

The State attempts to mitigate this by pointing out that the sheriff testified that he had been misquoted and did not permit the publication; District Attorney Bofill "Bo" Duhe testified as to his belief that he was speaking "off the record" and the information officer, Captain Ryan Turner, testified that he had been left with the impression that the story would not run in the newspaper. Furthermore, Defendant candidly admits that the trial court did not make a "specific credibility finding" regarding anything related to the subject news account.

The State's attempt to blunt this potential pitfall, though, misses the point. Regardless of who was on the record, who was accurately quoted, and whether the reporter had the proper permission to run his story, the story did run. And it ran with damaging assertions of fact and with damaging attributions of quotations. Flanagan even testified that on several prior occasions, Duhe requested he not run a story on the eve of a criminal trial for fear of potentially tainting the jury pool. It does, then, weigh in favor of a change of venue, but only up to a point.

While the contents of this newspaper article (and the additional press coverage it spawned) certainly left a negative impression of Defendant with anyone who read it, it still was but one news item. It does not establish the existence of such prejudice in the collective mind of the community that a fair trial is impossible. Moreover, it does not equate to the "actual prejudice" that must be proven by Defendant.

*Length of Time Between Publicity and the Trial*

It is uncontested that the newspaper articles and the news broadcasts at issue were printed and aired only a few days prior to trial. Defendant argues that this factor weighs heavily in his favor since the publicity was fresh in the community's mind. In *Magee*, the defendant complained that the media coverage of the crime resumed in the days immediately preceding the commencement of trial:

> For example, the defendant cites to a news article appearing on the front page of the newspaper on October 10, 2009, two days before voir dire examinations commenced and to the district court's own admission that it had viewed television coverage of the case on the morning of October 12, 2009.

*Magee*, 103 So.3d at 302, n.8. Despite the news coverage days before trial, the supreme court focused on the fact that the trial court repeatedly cautioned jurors against exposing themselves to television, internet, newspapers, radio, and "anything of that nature." *Id.* at 302. The supreme court also noted that the trial court instructed the jurors that their decision must be based solely on what they saw and heard in the courtroom and allowed defense counsel to question each juror individually as to his or her exposure to media coverage. The supreme court further stated:

> All of the jurors who served on the defendant's jury confirmed they would be able to put aside any information they gleaned from outside sources and decide the case only on the evidence presented. As a result, the defendant has failed to demonstrate that the length of time between any pre-trial publicity and the date of his trial affected his right to an impartial jury.

*Id.*

In the present case, the trial court issued a gag order the day before jury selection began. The trial court stressed the basic rule that the case must be

decided only on evidence presented in the courtroom. The trial court also admonished the jury not to communicate with anyone about their jury service and not to read the newspaper, not to watch the news about any cases, and not to seek out information about any cases. Furthermore, each of the jurors who were exposed to pre-trial media coverage and actually served on the jury stated that they had not formed an opinion about Defendant's guilt or innocence or would be able to decide the case based only on the facts presented in the courtroom. Thus, as the court in *Magee* determined, Defendant in the present case has failed to demonstrate that the length of time between the pre-trial publicity and the date of his trial affected his right to an impartial jury.

*The Severity and Notoriety of the Offense*

Defendant argues that this factor weighs in favor of a change of venue since all of the crimes alleged against him were both severe and notorious in the community. Defendant notes that "[s]ome potential jurors testified that hearing about Mr. Segura's crimes caused them to be concerned about their safety just venturing out into the community, and others testified that they had heard about the alleged crimes from discussions at work or with friends." In analyzing this factor, the supreme court in *Magee* pointed out that Magee's case was not the first capital case to be tried in St. Tammany Parish. Additionally, the court noted, Magee's case did not receive any more notoriety than other capital cases. Thus, the supreme court held, "the publicity received by the present case does not appear unprecedented." *Id.* at 303.

Applying this same analysis to the present case, several murder and aggravated kidnappings have been committed in Iberia Parish. In *State v. Authorlee*, 12-1179 (La.App. 3 Cir. 4/3/13), 111 So.3d 1170, the defendant was

13

convicted of killing an Iberia Parish woman by cutting her throat from ear-to-ear with an incision deep enough to sever her throat and jugular vein and deep enough to leave a tool mark on her back vertebra. In 2012, Defendant in this case was convicted of the aggravated kidnapping and armed robbery of a deputy while Defendant was housed at the Iberia Parish Jail. *State v. Segura*, 12-899 (La.App. 3 Cir. 3/6/13), ___ So.3d ___. In *State v. Francisco*, 12-455 (La.App. 3 Cir. 11/7/12), 101 So.3d 617, *writ denied*, 12-2654 (La. 5/31/13), 118 So.3d 388, the defendant and a co-defendant entered a pawn shop in Iberia Parish, shot and killed the owner of the pawn shop, and stole some guns. Further, in *State v. Williams*, 01-998 (La.App. 3 Cir. 2/6/02), 815 So.2d 908, *writ denied*, 02-578 (La. 1/31/03), 836 So.2d 59, the defendant was convicted in Iberia Parish of aggravated burglary and second degree kidnapping when he entered the victim's home through a window, covered the victim with a blanket, took the victim's money and car keys, forced the victim into the trunk of her car, and left her there until she was discovered the following morning. Considering these cases, the severity and notoriety of the present offenses is not unprecedented in Iberia Parish.

*The Area from which the Jury is to be Drawn*

In support of this factor, Defendant alleges that Iberia Parish is a relatively small population, consisting of just 73,240 people as of the 2010 census. When analyzing this factor in *Magee*, the supreme court considered the size of the jury pool summoned for the case. Because the jury pool consisted of 500 people, with only 43% of the jurors polled having heard something about the case and only 11% being removed for having formed an opinion about Magee's guilt, the supreme court found that the large jury pool prevented a dearth of qualified prospective jurors. The record is silent as to the size of the jury pool in the present case, and

14

there was no testimony at the hearing as to this issue. The record is, therefore, insufficient to review this factor.

*Other Community Events that Either Affect or Reflect the Attitude of the Community or Individual Jurors toward Defendant*

In support of this factor, Defendant states the following: "[a]lthough the record does not contain references to other events in the community bearing on the motion to change venue, the defense contends that the balance of other factors supports changing venue." We disagree with Defendant. Nothing in this record relative to this factor advances his position or helps him with his burden of proof.

*Any Factors Likely to Affect the Candor and Veracity of the Prospective Jurors on Voir Dire*

In support of this factor, Defendant simply states, "As noted above, the nature and severity of Mr. Segura's alleged crimes and the highly inflammatory nature of the publicity were likely to influence the candor and veracity of the prospective jurors on voir dire." Again, Defendant's burden is not to show "likely" prejudice but to prove "actual" prejudice.

*Final Analysis*

After considering all of the *Bell* factors, the supreme court in *Magee* stated the following:

> In the final analysis, while the record reveals that some jurors possessed a general knowledge of the case, the defendant fails to demonstrate the existence of an overriding prejudice in the community that prevented him from receiving a fair trial. The defendant's arguments to the contrary notwithstanding, the record reveals that both counsel and the district court directly assessed each juror's ability to weigh the evidence and disregard any information or knowledge they might have possessed about the facts of the case.
>
> As noted above, this court has affirmed several rulings denying a change of venue in cases in which a similar percentage of jurors expressed a familiarity with the facts. *See Clark*, 02-1463 at 21, 851 So.2d at 1073; *Hoffman*, 98-3118 at 9, 768 So.2d at 555; *Connolly*,

15

96-1680 at 5, 700 So.2d at 815. More importantly, in this case, the percentage of prospective jurors excused for cause on ground of bias (13 of 123 prospective jurors examined or 11%) suggests that widespread knowledge of the crime in the community had not so tainted the venire that a fair trial in St. Tammany Parish was unlikely. In fact, the percentage of exclusions does not even approach a threshold showing of community-wide prejudice. *See Murphy*, 421 U.S. at 803, 95 S.Ct. at 2037-38 (that 20 of 78 venire persons examined were excused because of their opinion about the defendant's guilt "may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own."); *see also Lee*, 05-2098 at 34, 976 So.2d at 133 (even assuming that 16 cause challenges should have been granted by the district court and that the percentage of jurors excluded because of fixed opinions as to the defendant's guilt rose from 32% to 44%, the court found "these numbers consistent with other similarly situated cases in which venue was not changed."); *State v. Wilson*, 467 So.2d 503, 513 (La.1985) (although 24 of 39 prospective jurors examined had heard about the crime, only four were excused on grounds of bias, a percentage too low to support a finding of collective community prejudice sufficient to warrant a change of venue); *State v. Rodrigue*, 409 So.2d 556, 559 (La.1982) (although 26 of 30 prospective jurors examined in mock voir dire had heard about the case, only 9 had fixed opinions of defendant's guilt; change of venue not warranted).

In sum, based on the record below, the defendant has failed to demonstrate that the district court abused its discretion when it denied this motion for a change of venue.

*Magee*, 103 So.3d at 306 (footnote omitted).

Likewise, while the record in the present case reveals that some jurors possessed a general knowledge of the case, Defendant fails to demonstrate the existence of an overriding prejudice in the community that prevented him from receiving a fair trial. Like the jurors in *Magee*, the jurors who expressed prior knowledge of the present case were questioned on an individual basis in a sequestered setting. After the individual questioning, only 10% of the jurors were excused because of their exposure to pre-trial publicity, one percent less than in *Magee*. As the court in *Magee* found, this percentage suggests that widespread

knowledge of the crime in the community had not so tainted the venire that a fair trial in Iberia Parish was unlikely. Furthermore, the media's discussion of Defendant's other crimes does not warrant a different result in this case. In both *State v. Comeaux*, 514 So.2d 84 (La.1987) and *Lee*, 976 So.2d 109, the pre-trial publicity included discussions of other crimes committed by the defendants. Although the substance of the media coverage was discussed and considered by the courts in those cases, neither court found that the coverage warranted a finding that the trial court abused its discretion in denying the change of venue.

For the foregoing reasons, Defendant has failed to show that the trial court abused its discretion in denying the motion to change venue in the present case.

## CHALLENGES FOR CAUSE

Defendant argues that the trial court erred in denying defense challenges for cause against jurors who had heard about Defendant's alleged participation in other crimes. The trial court's denial of these challenges for cause, Defendant claims, forced Defendant to use peremptory strikes against the jurors, and, eventually exhaust all of his peremptory challenges.

According to La.Code Crim.P. art. 797, a defendant may challenge a juror for cause on the grounds that:

> (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according the law and evidence[.]

In *State v. Schmidt*, 99-1412, pp. 30-31 (La.App. 3 Cir. 7/26/00), 771 So.2d 131, 148, *writ denied*, 00-2950 (La. 9/28/01), 798 So.2d 105, *cert. denied*, 535 U.S. 905, 122 S.Ct. 1205 (2002), this court stated the following regarding the purpose of voir dire:

The purpose of voir dire is to test the competency and impartiality of prospective jurors to determine whether they are fit to serve on the jury. Voir dire is designed to uncover information about the prospective jurors, which may be used as a basis for challenges for cause or exercise of peremptory challenges. *State v. Berry*, 95-1610 (La.App. 1 Cir. 11/8/96); 684 So.2d 439, *writ denied*, 97-0278 (La. 10/10/97); 703 So.2d 603. When a defendant exposes the partiality of a juror, the juror may not be automatically excluded for cause. The state or the trial court may rehabilitate the juror by asking questions and obtaining answers demonstrating the juror's ability to decide the case impartially pursuant to law and evidence. Ultimately, the trial court has the power to determine whether or not a juror may be excused for cause. *State v. Turner*, 96-845 (La.App. 3 Cir. 3/5/97); 692 So.2d 612, *writ denied*, 97-2761 (La. 2/20/98); 709 So.2d 773.

To succeed on appeal with the claim that the trial court erroneously denied the challenge of a prospective juror for cause, a defendant must exhaust his peremptory challenges and show that the trial court's denial of his challenge for cause was an abuse of discretion. *State v. Cross*, 93-1189 (La. 6/30/95); 658 So.2d 683; *State v. Robertson*, 92-2660 (La. 1/14/94), 630 So.2d 1278; *appeal after remand*, 97-0177 (La. 3/4/98); 712 So.2d 8, *cert. denied*, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998); *Turner,* 692 So.2d 612. Once these factors have been established, prejudice is presumed and need not be shown by the defendant. *Id.*; *Cross*, 658 So.2d 683. In *Cross*, the Louisiana Supreme Court stated that a trial court's erroneous ruling on a challenge for cause, depriving the defendant of one of his peremptory challenges, "constitutes a substantial violation of [the defendant's] constitutional and statutory rights, requiring reversal of the conviction and sentence."

In the present case, Defendant exhausted all of his peremptory challenges. Thus, if the trial court erroneously denied one of his challenges for cause, prejudice should be presumed.

In *State v. Scott*, 04-1312, pp. 16-17 (La. 1/19/06), 921 So.2d 904, 921, *cert. denied*, 549 U.S. 858, 127 S.Ct. 137 (2006), *overruled on other grounds by State v. Dunn*, 07-878 (La. 1/25/08), 974 So.2d 658, the supreme court discussed the standard for reviewing the denial of challenges for cause:

A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. *State v. Cross*, 93-1189, p. 7 (La. 6/30/95), 658 So.2d 683,

686; *State v. Robertson*, 92-2660, p. 4 (La. 1/14/94), 630 So.2d 1278, 1281. . . . . "A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." *State v. Jones*, 474 so.2d 919, 926 (La.1985). However, a trial court does not abuse its discretion when it refuses to excuse a prospective juror on the ground he is not impartial where, after further inquiry or instruction, the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and evidence. *Robertson*, 92-2660 at p. 4, 630 So.2d at 1281.

Accordingly, we will review the challenges for cause denied by the trial court to determine whether the trial court abused its discretion.

In his brief, Defendant asserts that the Louisiana Supreme Court has cautioned against denying a cause challenge on a juror who has been exposed to other crimes information and remembers it. In support of this assertion, Defendant cites this excerpt from *State v. Goodson*, 412 So.2d 1077, 1081 (La.1982):

A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to the prospective juror's testimony as to state of mind.

In *State v. Bolden*, 95-749 (La.App. 3 Cir. 4/17/96), 680 So.2d 6, *writ denied*, 96-1272 (La. 11/22/96), 683 So.2d 286, this court addressed the implication of the above statement by the supreme court. This court acknowledged that since *Goodson*, there has been no real discussion in the case law about the "damage that prior knowledge of a confession can do to a juror's impartiality[.]" *Id.* at 30. Nonetheless, the court in *Bolden* stated:

However, the *Goodson* court clearly considered prior knowledge of a confession among the most tainting factors possible, and one that does not allow for rehabilitation. The *Goodson* court clearly delineated degrees of taint for potential jurors. Apparently, the *Goodson* court decided advance knowledge of a confession was so prejudicial that rehabilitation should not even by pursued.

*Id.* However, the court in *Bolden* distinguished *Goodson* as applying only to venue questions and as never intended to be applied as a standard for challenges for cause. *Id.* at 30. Moreover, the *Bolden* court stated, "[u]sing *Goodson* as a standard for causal challenges is in contradiction of La.Code Crim.P. art. 797(2), which clearly provides for rehabilitation of biased jurors." *Id.* at 30-31 (footnote omitted). In support of this statement concerning *Goodson,* the court in *Bolden* footnoted the following excerpt from *State v. Lee*, 559 So.2d 1310 (La.1990), *cert. denied*, 499 U.S. 954, 111 S.Ct. 1431 (1991):

> When a juror expresses a predisposition as to the outcome of a trial, a challenge for cause should be granted. Yet, if after subsequent questioning the juror exhibits the ability to disregard previous views and make a decision based on the evidence presented at trial, the challenge is properly denied. When assessing whether a challenge for cause should be granted, the trial judge must look at the juror's responses during her entire testimony, not just "correct," isolated answers; or, for that matter, "incorrect," isolated answers. (Citations omitted.)

*Bolden*, 680 So.2d at 31, n.4.

Subsequently, in *State v. Smith*, 96-261 (La.App. 3 Cir. 12/30/96), 687 So.2d 529, *writ denied*, 97-314 (La. 6/30/97), 696 So.2d 1004, this court again applied the analysis in *Lee*, rather than relying on *Goodson*, to dismiss a juror for cause because the juror was exposed to significant information. In *Smith*, the prospective juror was told by a co-worker that the defendant had killed a former wife and his present wife. The defendant challenged the juror for cause, but the challenge was denied. On appeal, the defendant cited *Goodson* in support of his argument that the juror should have been excused for cause. This court, however, cited *Lee* and upheld the denial of the challenge for cause, stating the following:

> Although the reference to the defendant's killing of a second wife was highly significant and incriminating, inadmissible information, the

record clearly reflects that juror Bertrand was sufficiently rehabilitated by the trial court. In fact, Mr. Bertrand told the court he took the co-worker's statements with a grain of salt. Mr. Bertrand further added that the comments would not enter into his determinations of guilt or innocence of the defendant or affect any other decision he may be required to make in this case. In addition, Mr. Bertrand stated that he could decide the case strictly on the evidence presented to him in the courtroom.

*Id.* at 560. Thus, we will address each of the alleged erroneous causal denials using the standard set forth in *Lee* and applied by this court in *Smith.*

*Juror Brittany Gachassin*

During the trial court's individual questioning, Juror Gachassin stated that she heard about the case from her sister. When asked if her sister was reading the newspaper, Juror Gachassin replied, "Right." Juror Gachassin stated that she and her sister talked about the kidnapping charge against Defendant. When asked by the trial court what she and her sister talked about, Juror Gachassin replied, "She had heard - - like I said, it's hearsay. She had heard that - - something about kidnapping charges, maybe even a little something about a murder from years ago or something - - . . . - - of that sort. I really didn't get details." Juror Gachassin stated that she did not watch the news or read the newspaper. When asked if she had made a decision about whether or not Defendant is guilty or innocent of the pending charges or anything else, Juror Gachassin answered, "No, I haven't." Juror Gachassin agreed that she could keep an open mind, listen to the evidence, and give a fair trial to both Defendant and the State.

Defense counsel challenged Juror Gachassin for cause because of her exposure to publicity and her potential relationship to Defendant. The trial court denied the challenge for cause, finding that the juror clearly had no knowledge of a relationship with Defendant, that the information she received was very scant, and

21

that she could be fair and impartial.  Defense counsel eventually used a peremptory challenge to strike Juror Gachassin.  On appeal, Defendant argues that Juror Gachassin should have been dismissed because of her exposure to Defendant's kidnapping charges and Defendant's alleged confession to the Billeaud murder. Defendant alleges that Juror Gachassin's claim that she could give Defendant a fair trial should not be taken at face value given the nature of the information she heard.

Considering Juror Gachassin's statement that what her sister told her was "hearsay," along with Juror Gachassin's assurances that she could be fair, that she had not decided Defendant's guilt or innocence, and that she would listen to the evidence, we conclude that the trial court did not abuse its discretion in refusing to dismiss Juror Gachassin for cause.

*Juror Carol Fishburn*

Defendant argues that Juror Fishburn should have been removed for cause because she had read about the kidnapping charges, Defendant's alleged confession to the kidnapping charges, and the jail-hostage situation.  Additionally, Defendant alleges that Juror Fishburn seemed to have already made up her mind that a kidnapping took place based solely on what she read in the newspaper.

Defense counsel challenged Juror Fishburn for cause, arguing that Juror Fishburn remembered details about the Billeaud murder and the kidnapping.  The trial court denied the challenge for cause, reasoning that Juror Fishburn's general knowledge did not exclude her and reasoning that Juror Fishburn indicated that she could be fair and impartial.  Defense counsel used a peremptory challenge to strike Juror Fishburn.

On appeal, Defendant argues that "[g]iven that the defense theory was that there was no kidnapping, and instead this was a case of a drug deal gone bad . . . juror Fishburn's pre-conceived conclusion that a kidnapping had actually occurred, as well as her knowledge of the Billeaud murder, should have resulted in her removal for cause." Defendant did not make this "defense theory" argument in the trial court. Thus, that argument was not properly preserved. *See* Uniform Rules—Courts of Appeal, Rule 1-3. As for Juror Fishburn's knowledge of the Billeaud murder, Juror Fishburn agreed that she could set aside what she learned prior to trial and make a decision about the kidnapping case based on the evidence presented at trial. The trial court did not abuse its discretion in refusing to dismiss Juror Fishburn for cause.

*Juror Alfred Phillips*

Defendant alleges that the trial court erred in failing to dismiss Juror Phillips for cause since Juror Phillips remembered the news report regarding Defendant's confession to the Billeaud murder. During his individual voir dire, Juror Phillips testified that he saw a news report regarding the motion for change of venue. When asked by defense counsel if he remembered why Defendant was asking for a change of venue, Juror Phillips responded, "No. They said it's because of a crime that he supposedly confessed to, he said that he was involved in." After more questioning, Juror Phillips remembered that the confession was to murdering a lady. Juror Phillips stated, however, that he could set his knowledge aside while deliberating the instant case. Juror Phillips further stated, "I do try to go by evidence more than anything. I don't like to prejudge people." Finally, Juror Phillips stated that he really did not remember anything and that he could decide the case solely on the evidence presented in the courtroom. The trial court denied

defense counsel's challenge of Juror Phillips for cause, finding that Juror Phillips had only general knowledge and indicated that he could be fair and impartial. Defense counsel used a peremptory challenge to strike Juror Phillips.

Considering Juror Phillips' assurance that he could be fair and impartial, that he could decide the case solely on the facts presented in the courtroom, and that he did not like to prejudge people, the trial court did not abuse its discretion in refusing to dismiss Juror Phillips for cause.

*Juror Mandy Peltier*

Defendant asserts that Juror Peltier heard about the kidnapping while at work shortly after the kidnapping occurred. Because Juror Peltier works in the medical profession and the kidnapping occurred in a hospital parking lot, it was news in her community. Additionally, Defendant points out that Juror Peltier testified that she heard there was a rape involved.

During her individual questioning, Juror Peltier stated that while checking *Facebook* during her lunch break, she saw a post about a rape in the "IMC" parking lot. Juror Peltier did not read any stories in the newspaper, nor had she seen any posts on *Facebook* recent to the time of trial. Juror Peltier described the details that she heard as follows, "there was a girl and supposedly a baby was in the car with her. He took her to the ATM and then abandoned her in a field." Juror Peltier was not sure when the rape occurred. When asked if she had formed an opinion about the person's guilt or innocence, Juror Peltier shook her head negatively. As for her ability to put aside what she saw on *Facebook* and decide the case based on what she saw and heard in the courtroom only, Juror Peltier testified that she "absolutely" could do that and that she could give both the State

24

and Defendant a fair trial. When defense counsel challenged Juror Peltier for cause, the trial court denied the challenge as follows:

> Ms. Peltier was clear, forward thinking, up front about Facebook. It happened in March around the time it happened. Her recall was that the day we got it. She talked about the rape, and then she gave us the details of the facts. And I had to say, "Well, when did the rape occur?" She said, "Oh." She didn't even figure. They didn't talk about anymore. She didn't see any news. It was not posted again on Facebook. She didn't read the newspaper or anything. I think Ms. Peltier was very honest that she could be clear. Her body language, her certainty, and the totality of her testimony indicates to me that this challenge needs to be denied. And I'll deny the challenge and note your objection for the record.

By the time Juror Peltier was called on, Defendant had exhausted all of his peremptory challenges. Thus, Juror Peltier was accepted and served as a juror.

Considering Juror Peltier's minimal pre-trial exposure to the case and Juror Peltier's assurance that she could decide the case based only on the facts presented in the courtroom, the trial court did not abuse its discretion in denying Defendant's challenge of Juror Peltier for cause.

*Juror Karen LeBlanc*

Defendant argues that Juror LeBlanc should have been excused for cause because she testified that she read all of the newspaper accounts of the Defendant's situation, discussed the information with her neighbor, and recalled extensive details from the articles. Juror LeBlanc paid particular attention to the details, because Mrs. Billeaud's company dug the water well on her property. Juror LeBlanc also testified that one of the most disturbing things she read was that Defendant considered killing the victim in the kidnapping case.

Although Juror LeBlanc testified that she could disregard her knowledge and rely solely on the evidence presented in court, Defendant argues that these claims

were "unworthy of belief given her extensive knowledge of the newspaper articles."

During her individual questioning, Juror LeBlanc testified that she read both Thursday's and Sunday's paper and that she saw the headlines about the confession. Juror LeBlanc stated that she paid particular attention since the Billeauds "sunk" her water well. Juror LeBlanc also testified as to specifics regarding Defendant's confession – that he confessed to killing Ms. Billeaud, that he told the authorities that the murder weapon and money bag were in a shed, that it cost $136,000.00 to find the evidence, and that Defendant said he considered killing the lady he kidnapped. When asked if she would be able to put everything she learned aside and give Defendant a fair trial, Juror LeBlanc responded:

> I would hope that I could. I'm usually a fair-minded person, and I have a very big respect for the law. As a matter of fact, I don't even have a speeding ticket. It does a little bit concern me about the part where it - - I guess I'm thinking if they have this in the paper that he said, "I wanted to kill this person," then he had to have kidnaped her, and that kind of bothers me. I would hope that I could put that out of my mind and listen only to the facts because I'm usually definitely a fact person from doing charts at the hospital.
>
> . . . .
>
> I think I could. I just - - I just hope I - - I'm just hoping subconsciously that it wouldn't stay there.

The trial court had the following colloquy with Juror LeBlanc:

> Q: Assume this: Assume the facts come in and there is no evidence that he kidnaped anybody. Could you say not guilty?
>
> A: Yeah. If there's no evidence, then yes.
>
> Q: That he kidnaped anybody. If the State didn't prove him guilty beyond a reasonable doubt, could you say not guilty?
>
> A: Yes.

Finally, Juror LeBlanc stated that she would base her decision solely on the evidence presented in the courtroom, that she had not formed an opinion as to Defendant's guilt or innocence, that she strongly believed a person is innocent until proven guilty, and that she tries not to judge people.

The trial court denied Defendant's challenge of Juror LeBlanc for cause, stating the following:

> Ms. Leblanc came in, and her hesitancy really was an open-ended question before they had all of the facts of the information. She is a fact-oriented person. That is her skill set. She is a person who understands the importance of details, so she recalls them. While she doesn't watch TV, she reads the newspaper. I think when we gave her all of the information that was pertinent to her making that decision, it was clear with her ready answers and her open responses that she can put that aside and be fair. I deny the challenge for cause on Ms. LeBlanc.

Defendant used his only remaining peremptory challenge to strike Juror LeBlanc as an alternate juror.

Although Juror LeBlanc was initially hesitant on her ability to set aside what she had learned, her later answers were definite that she would set aside what she learned and decide the case only on the evidence presented at trial. Thus, the trial court did not abuse its discretion in denying Defendant's challenge of Juror LeBlanc for cause.

*Juror Vanessa Domingue*

Defendant claims that the trial court erred in refusing to dismiss Juror Domingue for cause because Juror Domingue recalled that Defendant confessed to the Billeaud murder and the "prison thing." Juror Domingue had read the newspaper and watched the television broadcasts about the case. Furthermore, Defendant asserts, Juror Domingue knew the husband of the alleged victim in the kidnapping case.

27

During her individual voir dire, Juror Domingue stated that she read the newspaper article from the *Daily Iberian* that stated that Defendant confessed to the Billeaud murder and the prison uprising. Juror Domingue discussed what she read with co-workers and family. Juror Domingue thought she may have also seen something on television. Additionally, Juror Domingue stated that she knew the family of the husband of the kidnapping victim. According to Juror Domingue, she grew up within a mile of the victim's husband and went to school with him. Juror Domingue does not, however, see the victim's husband on a regular basis. When asked if she could put the information she learned aside and decide the case solely on the evidence presented in the courtroom, Juror Domingue stated that she could. Juror Domingue stated that she had not formed an opinion as to Defendant's guilt or innocence and that she could be fair and impartial to both the State and Defendant.

When defense counsel challenged Juror Domingue for cause, the trial court denied the challenge. Since Defendant had exhausted all of his peremptory challenges, he was not able to strike Juror Domingue, and she ended up serving as a juror in the case. Considering Juror Domingue's assurances that she could decide the case based on the evidence presented in court and that she had not formed an opinion as to Defendant's guilt or innocence, the trial court did not err in refusing to dismiss Juror Domingue for cause.

## DECREE

Defendant's conviction is affirmed.

**AFFIRMED**.